08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    1

```
1                IN THE UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

3   BRADY SCHMITENDORF, individually
    and on behalf of all others
4   similarly situated,

5              Plaintiff,

6       vs.                          District Court
                                     Case Number
7   JUICY'S VAPOR LOUNGE, INC.,      22-2293
    an Oklahoma Corporation
8

9              Defendant/
               Third-Party Plaintiff
10
        vs.
11
    EYERATE, INC.,
12
               Third-Party Defendant.
13

14             TRANSCRIPT OF PROCEEDINGS

15
        On the 28th day of August, 2023 at 11:00 a.m. came
16  on to be heard in the Motion for Leave to Amend in the
    above-entitled and numbered cause before the HONORABLE
17  GWYNNE E. BIRZER, Magistrate Judge of the United States
    District Court for the District of Kansas, Sitting in
18  Wichita.
        Proceedings recorded electronically.
19      Transcript produced by machine shorthand and
    computer-aided transcription.
20

21  APPEARANCES
22
        The Defendant and Third-Party Plaintiff, Juicy's
23  Vapor Lounge, Inc., appeared by and through:
        Mr. Mark Schmitz
24      Knight Nicastro MacKay, LLC
        304 W 10th
25      Kansas City, MO 64105
```

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    2

```
 1          The Third-Party Defendant, EyeRate, appeared by
 2   and through:
            Mr. Charles Cooper
 3          Shook, Hardy & Bacon, LLP - KC/Grand
            2555 Grand Boulevard
 4          Kansas City, MO 64108

 5          Mr. Thomas Woods
            S&T Enterprises
 6          1600 NE Coronado Drive, #242
            Blue Springs, MO 64104

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    3

1              (The following proceedings were electronically
2     recorded and have been requested transcribed:)
3              COURTROOM DEPUTY:  All rise.  United States
4     District Court for the District of Kansas is now in
5     session.  The Honorable Gwynne Birzer, presiding.
6              THE COURT:  Thank you, counsel, you can be
7     seated.  Thank you.
8              All right.  Good morning.
9              UNIDENTIFIED SPEAKER:  Good morning.
10             UNIDENTIFIED SPEAKER:  Good morning, Your Honor.
11             THE COURT:  Okay.  So we've got -- let me go
12    ahead and call the case and get our appearances because
13    we are making a record.
14             All right, so the Court will call the matter of
15    Ray Schmitendorf, individually, and on behalf of all
16    other similarly situated -- versus Juicy's Vapor Lounge,
17    Inc. and then EyeRate, Inc.
18             And just so that we can open the record, can I
19    have appearances, please.
20             I did excuse plaintiff's counsel because I saw
21    this as a dispute between the defendant and the third
22    party defendant.
23             So for Juicy's Vapor now can we have appearances,
24    please.
25             MR. SCHMITZ:  Good morning, Your Honor.  Mark

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    4

1  Schmitz for Juicy' Vapor Lounge.

2          THE COURT:  Good morning.

3      And then for EyeRate.

4      MR. WOODS:  Morning, Your Honor.  Thomas Woods

5  for third-party defendant, EyeRate, Inc.

6          THE COURT:  Okay.

7      MR. COOPER:  And Charles Cooper also for

8  EyeRate, Inc.

9          THE COURT:  All right.  So this is an

10  interesting case, counsel.

11      And so I have had a chance to review the docket in

12  this case and so I've reviewed Juicy Vapor Lounge's

13  motion for leave to amend the third-party complaint with

14  Exhibits 1 through 9, or A through I, however they are.

15      And then I've looked at EyeRate's response with

16  Exhibits 1 through 4.

17      And then I've reviewed Juicy's Vapor Lounge's

18  reply.  So I do think I have kind of a handle on the

19  disputes that are here.

20      I've also -- you know just I have some questions

21  for you folks.  I have looked at some case law that some

22  of you -- you know, that some of you cited in some of

23  your briefings and so I think I got it.  And then some of

24  my last rulings with regard to discovery requests or

25  anything like that and so I think I'm all in.

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    5

```
 1          So anything else, Mr. Schmitz, that you think I
 2   should have reviewed to kind of get me on top of this?
 3          MR. SCHMITZ:  The only thing I can think of is I
 4   think that some of the arguments EyeRate had made in
 5   opposition to the motion for leave to amend the
 6   third-party were split between their actual response to
 7   the motion and then there were some that were kind of
 8   trickled in with their -- I believe it is their reply in
 9   support of their motion to dismiss the original
10   third-party petition.
11          THE COURT:  Mm-hmm.
12          MR. SCHMITZ:  To the extent they are -- I tried
13   to address them and bring them to the fore in the reply
14   brief.
15          THE COURT:  I saw that, yeah.
16          MR. SCHMITZ:  So having reviewed that probably
17   correct, but I just wanted to touch all bases there, Your
18   Honor.
19          THE COURT:  Okay.  I got it.
20          You know I also saw the exhibits that included the
21   deposition notices.  I didn't say that specifically but I
22   did review all of the exhibits.
23          And so, Mr. Woods, Mr. Cooper, anything that you
24   think that I should have reviewed to kind of get a handle
25   on this?
```

08/28/2023     SCHMITENDORF v. JUICY'S     22-2293     6

```
1              MR. WOODS:  Your Honor, you know the only thing
2  -- Thomas Woods here.
3         The only thing that I would clarify is I know you
4  look a lot that had to do --
5              THE COURT:  I sure did.
6              MR. WOODS:  -- with the third-party petition --
7              THE COURT:  Mm-hmm.
8              MR. WOODS:  -- and the briefing related to that.
9         I just wanted to make sure that something that
10  might shed a little light is looking at when you pull the
11  docket, Mr. Schmitendorf's complaint, too, is probably
12  one other thing that should shed some light on some of
13  the arguments being made.
14             THE COURT:  Mm-hmm.
15             MR. WOODS:  And I'll wait and see if you have
16  questions and I can explain how that factors in.
17             THE COURT:  Okay.  I mean I am familiar with the
18  complaint which is how we -- you can be seated, which is
19  how we figured that we should excuse him from this
20  because I didn't realize -- I mean unless you wanted him
21  here but just looking at that I didn't think that he
22  really had a bone or a dog in this situation so but if
23  there is, certainly there is some relevant portions I
24  want you to be able to refer to them.  Okay?
25             So it looks like Juicy's Vapor Lounge is seeking
```

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    7

 1  to drop the -- wants to drop the breach of contract and

 2  warranty claims and instead allege only negligence and

 3  negligence res ipsa loquitur.

 4      And you're saying that EyeRate was negligent

 5  because you only asked the marketing text to be sent to

 6  plaintiff one time and then instead, it was sent four

 7  times in two days, like that.  And then I do have the

 8  EyeRate's response so I want to just kind of move through

 9  that.

10      And I have reviewed your brief and so I understand

11  it but if there is anything additional that you wanted to

12  argue then now would be the time to do that.

13      MR. WOODS:  Yes, Your Honor, I think that you've

14  hit the -- certainly the essence, the primary thrust.

15  There's a little bit of, as well on the -- as far as the

16  opt-out aspect not just the sending --

17      THE COURT:  Mm-hmm.

18      MR. SCHMITZ:  -- but then when the recipients

19  responded to EyeRate and opted out, there were kind of

20  two aspects of that and the proposed amended negligence

21  count was Subsection B, as we headed it there, with

22  respect to, generally, the internal Do Not Call Lists

23  Policies and Procedures, and failure to prescribe against

24  the federal but then also failure to report to -- that

25  anyone had opted out, much less anyone who had opted out

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    8

1  to Juicy's that anyone who had opted out via EyeRate was

2  automatically included in the second vendor Juicy's used

3  and so there's that half, or aspect of the negligence

4  claim as well.

5        THE COURT:  Mm-hmm.  Okay.

6        But -- okay.  So we know EyeRate has their motion

7  to dismiss that is still pending with Judge Crouse so we

8  know that.

9        And then EyeRate also alleges that you know they

10  don't have a contract with you so you don't have a breach

11  of contract claim anyway and you know this negligence

12  thing is just really and truly at the end of the day,

13  just in reviewing their response, that you are just

14  gasping at straws to try to revive any action that you

15  could have.

16        So the questions that I have is, okay, so you

17  alleged that EyeRate owed you a duty of reasonable care.

18  How was that duty established if there -- you know, for

19  one thing, if there's no -- and I know that that duty of

20  care wouldn't relate to the contract but to the

21  negligence thing?  Especially if they didn't have an

22  action -- they didn't have an action that was a crime you

23  know and your client owns Juicy and Chronic, right?

24        MR. SCHMITZ:  In all candor, Your Honor, I'm not

25  familiar with all of the particulars of the ownership

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    9

1  structure relative to Chronic.  I and my firm, we don't

2  represent Chronic in any of those entities and so I don't

3  want to get inaccurate information.  I have to generally

4  apologize to say I can't answer those because I don't

5  know the answer.

6        We are familiar with Juicy's Vapor Lounge and can

7  speak to it.  We know it is a separate corporate entity

8  from Chronic Co., which as I understand it Chronic Co is

9  a D/B/A of a separate corporation in Ponca City --

10           THE COURT:  Mm-hmm.

11           MR. SCHMITZ:  I think Ponca City Dispensaries,

12  Incorporated.  Apologize if I got that.

13           THE COURT:  See all this trouble this marijuana

14  has caused everybody?  You know, the pundits were right,

15  weren't they?

16        Here we thought everybody was going to be walking

17  around high.  We got disputes, huh?

18           MR. SCHMITZ:  My client would probably get mad

19  at me if I didn't know that Juicy's Vapor Lounge location

20  did not sell marijuana, it is sells vapes, so

21  E-cigarettes like Juuls and things like that, and that

22  genre.

23        But so as far as, I apologize, Your Honor,

24  and -- and I do apologize, I'm not able to answer your

25  question on that.

```
 1                THE COURT:  Well, I mean that's -- you know,
 2   that's unfortunate you know because based upon the
 3   information that I reviewed it seems like you know Juicy
 4   and Chronic is you know one in the same person.  You
 5   know, the owner is one person and so you can't un-know
 6   [sic] it and I agree that you know you don't want to drag
 7   Chronic into this but I'm -- do you deny that, you know,
 8   no written contract exists between Juicy's and EyeRate?
 9        I mean can you -- you can't deny that though,
10   right?
11                MR. SCHMITZ:  Based on what I -- based on the
12   information I have been able to gather right now I think
13   it is likely accurate to say there is not a written
14   agreement between Juicy's and EyeRate.
15        There's a fair amount of background that I have
16   been -- that I -- I am prepared to give as far as the
17   search and how -- kind of procedural how we got here with
18   respect to the procedural and breach of contract that I
19   am more than happy to go into, though we do need -- we do
20   want to note that written contract is not required for a
21   contract.  There are a variety of other forms:  Oral,
22   implied, equitable.
23                THE COURT:  I understand.  I get it is.
24                MR. SCHMITZ:  And so just because there is not a
25   written agreement between EyeRate and Juicy's doesn't
```

1  mean there is not a contract between EyeRate and Juicy's.

2        Our thinking with respect to the proposed

3  amendment is given what we've learned with respect to how

4  texts two plus -- two, three, four, however many were

5  sent out to Mr. Schmitendorf, and however many putative

6  class members --

7            THE COURT:  Mm-hmm.

8            MR. SCMITZ:  -- given what we have now learned,

9  our thought is we don't need to deal and sift through all

10 the contract things.  There's a far more simpler, more

11 efficient way to resolve the -- who result in the liable

12 question.

13       So our -- generally Juicy's contention with

14 respect to the third proposed amended negligence count

15 is -- and I'll say this a little colloquially, first

16 text, that's on us; texts two plus, that's on EyeRate.

17       Obviously we are not conceding liability relative

18 to plaintiff, that's for another day.  That is generally

19 the thrust, however, of the proposed amended pleading

20 that we have got here and that's a lot based on as we

21 detailed -- as we outlined in some detail in the motion

22 to amend information that we gathered through the

23 discovery process after the original third-party petition

24 was filed --

25            THE COURT:  Mm-hmm.

1          MR. SCHMITZ:  -- with respect to the involvement

2   of Plivo and how EyeRate and this other third-party

3   Plivo, how they function.  That was all unknown to us

4   until relatively recently.

5          THE COURT:  Gotcha.

6      So then -- so the duty of reasonable care that you

7   allege that EyeRate owes to you stems from the negligence

8   claims and -- and anything after the one text.  Okay.  I

9   got it.

10          MR. SCHMITZ:  That is correct, Your Honor.

11          THE COURT:  Okay.  Gotcha.

12      So then if -- if a substantive law was applicable

13   here, which state's negligence law would you think would

14   apply here?

15      EyeRate argues Kansas, right?

16          MR. SCHMITZ:  I believe EyeRate is arguing

17   California.

18          THE COURT:  Okay, EyeRate is arguing California.

19   And then you're arguing --

20          MR. SCHMITZ:  Kansas, Your Honor.

21          THE COURT:  -- Kansas.

22      And so then -- so then but isn't it kind of the

23   same, you know?

24      I mean you -- you know there's got to be like

25   a -- you know, you can't do it on economic loss alone,

1   there's got to be some physical harm and some injury like

2   that.  Isn't it the same, though?  Isn't Kansas and

3   California -- so why we quibbling over that when the

4   requirements are basically the same?

5           MR. SCHMITZ:  We agree generally, Your Honor,

6   that the outcome here we think is going to be the same

7   regardless of whether we apply Kansas or California law.

8           THE COURT:  Okay.

9           MR. SCHMITZ:  I think that the economic loss

10  doctrine we can put a pin in that and touch later but we

11  don't think that that applies because the economic

12  doctrine is not simply is there a contract, it is a

13  question of which duty was breached.  And here the duty

14  that we are alleging to be breached exists independent of

15  any contract.

16          If there was a contract then essentially you've

17  got to perform the services under the contract properly.

18  If there is not a contract then you have to exercise the

19  reasonable care under the circumstances.  In either

20  situation we think that the sending of texts two plus,

21  given that Juicy's only ever asked one, that that is the

22  negligent breach.

23          Again, whether it's in the context of a

24  contractual relationship or not, the way that the

25  economic loss doctrine would come out we believe does not

1   disturb that underlying question of the nature of the

2   claim and how the contractual -- or the -- I

3   apologize -- the vehicle of liability attaches.

4        And, again, I think that one of the other issues

5   that we need to touch on is if EyeRate is correct that

6   the economic loss doctrine applies then that means that

7   there would have to be a contract for EyeRate to have

8   breached and that would just be a reason that we should

9   have the breach of contract claim.  If that's the end

10  result, A, I don't know that necessarily the motion

11  that's in front of the Court is the proper mechanism --

12        THE COURT:  Right.

13        MR. SCHMITZ:  -- to address that but if that is

14  the end result then that seems to be a very strong reason

15  that the breach of contract claim needs to stay, or

16  should stay, if they're saying -- because it is either

17  breach of contract and economics loss doctrine bars

18  negligence, or there is no contract, and economic loss

19  doctrine can't bar negligence.

20        THE COURT:  Mm-hmm.

21        MR. SCHMITZ:  That's the tension that we're

22  seeing here.  And it's ultimately -- there's a lot of

23  confusion and hecticness [sic] in this in that --

24        THE COURT:  What about -- I mean you can still

25  kind of fit it in, I mean you know there's an exception

1  you know to the economic loss rule and duty is involved

2  in that whether or not there's a contract breach, right?

3      So I mean you could do it that way.

4      MR. SCHMITZ:  And that is one of the arguments

5  that we were making here, Your Honor, is that it -- it's

6  unclear at this point whether EyeRate actually thinks

7  there is a contract or not.  From our perspective --

8      THE COURT:  EyeRate don't think there is a

9  contract.  EyeRate already said there is no written

10 contract.

11      MR. SCHMITZ:  Well, I thought that, too, until I

12 saw the economic loss doctrine argument because -- and of

13 course the attempt to impose the contractual choice of

14 law provision.  When I see those two arguments --

15      THE COURT:  Mm-hmm.

16      MR. SCHMITZ:  -- then -- contracts or not and I

17 have been trying to figure out a clean answer to that

18 from EyeRate.  I don't currently have that.

19      THE COURT:  So you going to dump it on my lap to

20 try to figure out.  I got it.

21      So, Mr. Schmitz, then you said that there -- you

22 know I mean we kind of agreed that no written contract

23 exists and there's some confusion as to whether or not

24 you know there's a meeting of the minds with regard to

25 some kind of relationship and I recognize in a negligence

1  claim you don't need that kind of a contractual

2  relationship but what kind of contract are you

3  thinking -- if you don't have a written contract, what do

4  you think -- what makes them owe you?

5       You know is it because you gave them permission to

6  do one thing and then they took it upon themselves as you

7  allege to do like at least four different things?  Four

8  additional things?

9       MR. SCHMITZ:  In that sense we are just

10  distilled down, yes, Your Honor.

11       THE COURT:  Okay.  So does the -- did TCPA you

12  know does that create a duty owed by EyeRate to you?  I

13  mean is that -- I wasn't clear on that.  I'm just trying

14  to figure out because it is quite a quandary to me

15  that -- that has been created here and I want to know if

16  it's there or is it just -- or are we chasing rabbits you

17  know.

18       MR. SCHMITZ:  Your Honor, we don't think there

19  is a rabbit being chased here and part of this derives

20  from a Kansas Supreme Court case that we have cited,

21  the -- I believe it was decided in 2017 or 2018, I can

22  get the cite for you in a moment.

23       Ultimately, that Kansas Supreme Court case said

24  that for quite awhile attorneys had been incorrectly

25  pigeonholing all questions of breach into the duty and

1  that generally plaintiffs' attorneys were framing all of

2  the breach questions into the duty and that generally

3  plaintiffs attorneys were framing all of the duty

4  questions into a breach, which is a legal question, and

5  turning the breach question to just kind of a yes or no,

6  did you do that.

7          THE COURT:  Mm-hmm.

8          MR. SCHMITZ:  Kansas Supreme Court said that's

9  not what we are supposed to do.  The duty is always the

10  same to act reasonably under this instances.  What it

11  means to act reasonably under the circumstances can be a

12  factual question generally for the jury that's going to

13  have to be based on the circumstances of the case.

14          THE COURT:  Mm-hmm.

15          MR. SCHMITZ:  So apply that --

16          THE COURT:  But that's for another day.

17          MR. SCHMITZ:  Exactly.  And so our general

18  argument as to the nature of the breach here is that in

19  the context of and in the confines of this case and what

20  happened here the duty to act reasonably in this case was

21  breached when EyeRate sent the text more than one time.

22  And was breached when EyeRate did not report opt-outs to

23  Juicy.  And was breached when EyeRate did not do its own

24  internal call and did not [inaudible].

25          Those are the breaches that we're alleging are

1  factual questions.  It's both the question of not just a

2  yes or no did they do this, but is doing that required to

3  meet the duty of reasonable care and the Kansas Supreme

4  Court said that both of those two questions, the yes, no,

5  did you do it, and the secondary, did you have to do it,

6  that those are for the jury in a breach context not in a

7  what is the duty context.

8          THE COURT:  Okay.  So as we talk about that, I

9  mean so you -- Juicy -- I mean if EyeRate didn't have the

10  authority to send the additional text messages, you know,

11  just the one so and -- and was it really and truly

12  foreseeable, you know that there would be harm to Juicy's

13  for doing that?  I mean I understand that you know they

14  didn't -- you know you're alleging that they didn't you

15  know follow directions, didn't you know do the things

16  that you would normally do before a text message is sent

17  out as you indicated but how -- is that really and truly

18  foreseeable that you would have the kind of harm that is

19  required in this case?

20      I wouldn't have thought but then I had to read the

21  law to get there, right?

22          MR. SCHMITZ:  Yes, Your Honor, we do think it is

23  foreseeable for a few reasons.

24      Number one, the general nature of the business

25  that EyeRate is in, that they -- this is their business,

1  sending telemarketing text messages, dealing with the

2  TCPA, dealing with opt-outs from the TCPA, that is their

3  business.  And so when it comes to the receiver -- I send

4  this text message one time and one time only, and then

5  they send it more than one time that -- that -- the fact

6  that harm could flow from two plus text messages, two,

7  three, four, has to be foreseeable.

8              THE COURT:  But Mr. Schmitendorf may have been

9  having a bad day.  I mean how do we know it is not the

10  first text you permitted him to do that -- I mean I'm jut

11  talking about from a causation standpoint and I mean how

12  is the foreseeability of the harm that you say to -- to

13  the plaintiff have any bearing on the negligence claim

14  that you want to assert against EyeRate?  So I -- at the

15  end of the day I want you to kind of tie all that in

16  because it just, the change just doesn't seem -- it seems

17  disconnected.

18              MR. SCHMITZ:  I'm trying to make sure I

19  understand the question so I can better answer it.

20              THE COURT:  How does -- so you're saying it was

21  foreseeable you know that there would be harm.

22              MR. SCHMITZ:  Is your question about

23  foreseeability of harm to the recipients or foreseeable

24  to harm to Juicy's?

25              THE COURT:  To Mr. Schmitendorf.

1          MR. SCHMITZ:  Okay.

2          THE COURT:  The plaintiff that is suing you for

3    doing this have any bearing on the negligence claim that

4    you want to assert against EyeRate?

5          MR. SCHMITZ:  Certainly.  And I think it kind of

6    goes to the same underlying issue of EyeRate in its

7    arguments against the motion to amend is pointing to its

8    Terms of Service where it's soliciting representations

9    from the users of its service, that it's gotten all of

10   the required consents and everything else like that.

11         And so that would mean that EyeRate, if we take

12   that and apply that here, which I don't know we can given

13   the contractual issues, would mean that when Juicy says

14   send this one time only, EyeRate could plausibly infer

15   from that, you've got the necessary consents and

16   everything for one text message.  When you send it more

17   than once, they don't have that.

18         Additionally, in this case, with respect to

19   plaintiff Brady Schmitendorf, he opted out after the

20   second of the four text messages.  Text message three

21   from EyeRate, text message four from EyeRate both came

22   after Mr. Schmitendorf opted out.  And so there's

23   certainly got to be foreseeability there.  EyeRate's

24   received someone saying, Stop texting me, and they do

25   it -- they still send the text message three, and send

1 text message four.

2          As to the aspect of porting from EyeRate to

3 SlickText, the same thing.  You've got people coming in,

4 responding saying, Stop texting me, I don't want this.

5 And EyeRate didn't pass that information along to

6 Juicy's.

7          THE COURT:  Mm-hmm.

8          MR. SCHMITZ:  That Juicy's then wouldn't know

9 these people said, Stop texting me, I'm withdrawing my

10 consent, whatever the ultimate message is there, there's

11 going to be follow-up texts more likely than not and

12 whether EyeRate knew to a certainty there would be text

13 messages and the issue is, is it foreseeable there would

14 be more text messages to those people who opted out that

15 we didn't tell Juicy's opted out.

16          And we think that all of that shows the harms that

17 we're alleging here were certainly foreseeable given

18 especially the backdrop of the nature of EyeRate's

19 business.

20          THE COURT:  Okay.  The thing that is just you

21 know that is still bothering me, I mean I understand your

22 explanation is just how -- how EyeRate could foresee this

23 if Juicy's Vapor had no way to access the platform

24 without a written contract that only Chronic had, that's

25 the thing that -- that's just bother -- I'm going to have

1  to take a drink of coffee because that's bothering me.

2          MR. SCHMITZ:  Okay, so you're -- so I think that

3  your question is focussing on the foreseeability

4  specifically flowing through Juicy's --

5          THE COURT:  Mm-hmm.

6          MR. SCHMITZ:  -- as opposed to flowing through

7  some other entity.

8          THE COURT:  I mean, I moved on from

9  Mr. Schmitendorf, yeah.

10          MR. SCHMITZ:  Certainly.  And I can kind of

11  interpret your question as ultimate foreseeability, just

12  whomever the text is coming from, it's being received by

13  Mr. Schmitendorf and I think I understand your question

14  now flowing through Juicy's.

15          Ultimately I don't think that that's the question

16  of what the foreseeability asks.  That was we understand

17  it --

18          THE COURT:  Okay.  You don't think we even need

19  to get there?

20          MR. SCHMITZ:  Exactly.

21          THE COURT:  Okay.

22          MR. SCHMITZ:  But the fore -- isn't is

23  ultimately the harm, whether it goes through Juicy's,

24  whether it goes through Chronic, whether it goes to

25  someone else, the harm -- ultimate harm on

1  the -- Mr. Schmitendorf, that's what the foreseeability

2  analysis is to focus on in this context as I understand

3  the questions the Court is asking, Your Honor.

4          THE COURT:  Mm-hmm.  Okay.  Thank you.

5      Okay.  All right.  So, Mr. -- so Mr. Woods, or

6  Cooper, I'm not sure who is going to be talking about

7  this but you know, Mr. Schmitz says you took liberties

8  that shouldn't have taken and that's what makes you

9  negligent in this case and it was foreseeable that if you

10  continued to submit text messages regardless of your

11  access to the platform, or lack of, you should have not

12  done that.

13      So did you send more than one text?  Or two text

14  messages?

15          MR. WOODS:  Your Honor, according to either a

16  written contract or an implied contract, the answer to

17  that question is no.  And I can illustrate why if --

18          THE COURT:  Okay.

19          MR. WOODS:  -- if you'd like.

20          THE COURT:  Yeah, sure.  And I understand the

21  legal -- you know, that you have got some legal reasoning

22  you know based on whether or not there's a contract but

23  at the end of the day if this case gets to a jury they

24  are going to want to know, did you send one contract -- I

25  mean one text or did you send more than one?  And that is

1  the -- where the rubber is going to meet the road.  So

2  whether there was a contract or not, did EyeRate you

3  know -- was EyeRate given permission by something to send

4  one text message?

5       And Mr. Schmitz seems to think that one text

6  message -- not only one text message was sent but more

7  than one.  So did EyeRate send more than one text

8  message?

9         MR. WOODS:  No.

10         THE COURT:  Okay.  There we go.  All right.  Go

11  ahead.

12         MR. WOODS:  All right.  Thank you, Your Honor,

13  you're right on target.  But first off there's this

14  binary choice that is hitting you right now.  The binary

15  choice being there either was a contract or there was not

16  a contract and if there was not a contract, Juicy's has

17  got us operating in negligence land.

18         THE COURT:  Mm-hmm.

19         MR. WOODS:  Okay?  What we know, that there

20  isn't a written contract.

21       Now under the case law that Juicy cited, the

22  *Minter* case, *Minter versus Power Equipment*.

23         THE COURT:  Mm-hmm.

24         MR. WOODS:  It is on Page 7 of the footnotes in

25  their brief.

1          THE COURT:  Okay.

2          MR. WOODS:  It talks about timelines and

3    the -- the ripeness of the propriety of leave to amend in

4    connection with a motion to dismiss and it talks about

5    undue delay.  And at this point I'm wondering why, when

6    Mr. Schmitendorf filed this complaint in July of 2022,

7    and he put in it that on May 3rd text messages were sent,

8    and talking about paragraphs 24 through 27, and he shows

9    those text messages, their content, that they're Juicy's

10   Vapor Lounge, that they're coming from a 916, that's our

11   Sacramento area code number, that is where my client and

12   I come from, Juicy's knew in July what the basis for this

13   claim was for which they would be seeking what.  Not

14   damages in negligence but indemnity.  That's what this

15   is, but they are not pleading indemnity.  And they're not

16   pleading indemnity because there is only two flavors:

17          There is contractual, they don't have a contract.

18   And there is equitable, and they didn't do equity.

19   Because they used the EyeRate services without a written

20   agreement.  And so there are two -- there are two

21   elephants, and so you have either got the contract -- the

22   binary choices, you have either got the contract and they

23   don't have one.

24          THE COURT:  Mm-hmm.

25          MR. WOODS:  And if they did they would lose

1 because we know the terms of those contracts are, or you

2 don't have a contract and they want to be operating in

3 negligence.  But if they were operating in negligence,

4 they still lose and we can illustrate why.

5         And it's not just because of the factual question,

6 I'll get to that in a minute --

7             The court:  Mm-hmm.

8             MR. WOODS:  -- but there are two elephants in

9 the back of the room.

10             THE COURT:  Mm-hmm.

11             MR. WOODS:  One of them is called indemnity and

12 the other is called damages.  And we didn't talk about

13 damages.

14         Whether we're operating under choice of law of

15 California or Kansas, or distracted by the economic loss

16 rule that I only brought into the pleadings because I

17 couldn't understand the complaint, they were the ones who

18 pled the existence of a contract, whether we're talking

19 about any of those things, you still have to be damaged.

20         And when we started out on the third-party

21 petition, the one that we moved to dismiss on, the damage

22 was the judgment.  It was only the point, Well, there is

23 no judgment.  It's speculative.  It's speculative damage

24 on a negligence claim to say that that damage is

25 something that my client is responsible for because we

1  don't even have one.  For all we know, Juicy's is going

2  to prevail on the claim and there is never going to be a

3  judgment.

4       Now what Juicy's has moved on to is, well, it's

5  not the judgment, it's the attorneys' fees that we're

6  paying in order to overcome that judgment or win a

7  judgment against the plaintiff.

8       Well, if it's speculative to say that my client is

9  responsible for the judgment, it is equally speculative

10 to say my client is responsible for the attorney fees to

11 defend what probably is a litigation misadventure by a

12 third-party of Mr. Schmitendorf.  My client doesn't

13 control any of that.

14       THE COURT:  Well, no, I don't know about that,

15 Mr. Woods, because if -- I mean you say that you -- I

16 mean we're here because Juicy's contends that EyeRate

17 took liberties that they shouldn't have and that's why

18 we're here.  And you say that they didn't.  You know,

19 that you didn't.  So really and truly you could stand on

20 that you know and it would be a factual question.

21       I mean we already know that you know he's going to

22 get rid of -- he's seeking to get rid of the contractual

23 claim so I mean I already think we have a dispute about

24 that.  It's whether or not you know we can say that you

25 were negligent, you know, for taking the liberties

1   that -- that Juicy's Vapor is accusing you of.

2               MR. WOODS:  Right.

3               THE COURT:  You know.

4               MR. WOODS:  Then let's talk about that without

5   then getting to the missing element of damages.

6           The -- the issue of duty, you were right to say,

7   From where does that arise?

8               THE COURT:  Mm-hmm.

9               MR. WOODS:  And now we have an admission it

10  doesn't arise from the contract, even though that is what

11  we just spent months litigating, which is frustrating

12  but --

13              THE COURT:  Mm-hmm, right.

14              MR. WOODS:  -- the counter to that is that it's

15  a form of implied in fact contract, or a duty that gets

16  owed even though there is no contract.  That takes us to

17  the other binary choice.  What's being ignored or just

18  blown past -- ignored, the man behind the curtain, is the

19  deposition testimony.

20              THE COURT:  Mm-hmm.

21              MR. WOODS:  And while we may not have anybody

22  here today who is going to say that Juicy's is under a

23  unity of interest with Chronic that's the D/B/A for that

24  Ponca Dispensary, I don't know what the principle said,

25  I'm not the guy who owns Ponca City Dispensary and Juicy

1  said about the nature of the relationship and for me that

2  is what matters, that is under oath.

3          And I know what the PMK or the individual who was

4  operating under that contract for Juicy's Vapor Lounge,

5  who is the same fella who signed the contract for Ponca

6  City Dispensary said.  If we didn't have the contract and

7  you look at that testimony, it's Zach Kirby's testimony,

8  I want to say about page 16 or 17, where Mr. Kirby, who

9  is the owner of these two entities said that he is aware

10 that he's operating under EyeRate's Terms of Service.  So

11 whether he has got a contract or not, we know that he

12 doesn't.  But what he is operating under he says is Terms

13 of Service.

14         Now by the way, when you read the contract, when

15 you read what my client does as a business, 35 -- the

16 attachment to the motion to dismiss -- 35-1.

17             THE COURT:  Okay.

18             MR. WOODS:  When you look at what my client

19 does, Mr. Kirby, and Mr. Lundgrin are saying, We know

20 what EyeRate does.  We know their business.  There's

21 Terms of Service.  We're operating under that.

22         That is Mr. Kirby saying that if -- it's Juicy's,

23 saying that if they don't have a contract, the implied

24 contract, or the duties of the parties are the Terms of

25 Service.

1              THE COURT:  Mm-hmm.

2              MR. WOODS:  Because that's what implied contract

3  is.  That's the supposed business relationship.

4         That we didn't have a contract with you, and you

5  have no idea that we had come on to your platform and

6  started using what it is that you do, but our performance

7  that makes up the implied in fact contract or our

8  business relationship is according to your Terms of

9  Service.  So you've got to bring back in the Terms of

10 Service.  And the Terms of Service say that the user of

11 the platform is texting the customers.

12         So answering your question, Did my client send

13 text messages?  Juicy's knows that my client provides a

14 platform and from that, Juicy sends text messages,

15 Juicy's is responsible for the TCPA consents, and TCPA

16 compliance.

17         If you remember the original third-party

18 complaint, paragraphs 10 and 11, what do they say?  They

19 said that Juicy's kept the obligations and the

20 responsibilities to comply with all laws, including

21 federal laws.  So the contract, or the Terms of Service,

22 they don't delegate those duties to us .  That is not our

23 business.  And Juicy's complaint says that those duties

24 were not delegated to us and it is not our business.

25         So what's particularly problematic here, all the

1  things that we don't do -- so we're not responsible for

2  acquiring the TCPA consents from the customers for

3  electronic communications; we're not responsible in the

4  Warranty, Section 12, the user is responsible for not

5  only maintaining but keeping for the duration of the

6  relationship the consents and the ability to contact

7  customers.  Indemnity.  Indemnity for third-party claims

8  to TCPA, that goes to the users, not to us.

9        But they don't like the contract that was signed

10 by another entity.  And they don't like the terms of

11 service that they admit they were operating under.  And

12 they want to say, well, if we ignore that contract I can

13 then bring a negligence claim that says you have a duty

14 to do things that I know you don't do.

15        It is like hiring a plumber, and there's a

16 contract and that plumber is going to do all the plumbing

17 for you in your new build in your new house and you're

18 going to sign it but then you don't want to be bound by

19 it and you want to sue him for the electrical work that

20 got done.

21        The Terms of Service say, and the deposition

22 testimony says that Juicy's Vapor Lounge not only didn't

23 have a contract with us, but that they understood the

24 type of business that my client does.  And now they want

25 to ignore the contract and say, Let's put it away, let me

1  see one another day if I can.  But if you ignore it, then

2  I can bring this other claim that's going to tell a jury

3  that your client does things that they don't do.  And

4  they take responsibility in the marketplace for things

5  that we all know my client doesn't take responsibility

6  for.

7           THE COURT:  Okay, so then if you didn't send the

8  additional text messages, which you deny because Juicy

9  has access to the platform, are you saying Juicy sent the

10  additional texts?

11       And I know that that isn't -- you know, we don't

12  have to necessarily prove that but it just seems like

13  that's what you're suggesting.

14           MR. WOODS:  Well, what I'm --

15           THE COURT:  Because they have access to the

16  platform you say, right?

17           MR. WOODS:  Yes, but, Your Honor, there's -- you

18  asked a question earlier about kind of the speculative

19  nature of causation --

20           THE COURT:  Mm-hmm.

21           MR. WOODS:  -- and whether Mr. Schmitendorf had

22  a bad day.  If you look at their -- one of the things you

23  looked at, you looked at the discovery requests to extend

24  discovery.

25           THE COURT:  Mm-hmm.

1           MR. WOODS:  And there is Doc. 24.  That was

2   Juicy's motion for leave for a continuance of discovery

3   and other deadlines, or mainly discovery deadlines I

4   should say, excuse me.  Okay?  And in that, ECF 24,

5   paragraphs 3 and 4, Juicy's is talking about on April

6   18th, 2023 they received the expert reports that

7   obviously go to things like causation --

8           THE COURT:  Mm-hmm.

9           MR. WOODS:  -- and damages.  And if you look at

10  that the Bates stamp ranges include ER, the EyeRate

11  document production.  Right?  So subpoenaed

12  documents -- so subpoenaed documents were available to

13  them as early as April 18th.  They got them again on May

14  2nd.

15          So they knew the nature of their claims before

16  they brought that motion to you on I want to say May

17  12th.  And if you look at footnote 5 of their brief --

18          THE COURT:  Mm-hmm.

19          MR. WOODS:  -- footnote 5 says that they served

20  my client simultaneous with filing that motion for leave

21  to amend the scheduling order and get more time.  They

22  had everything in their possession.  They never requested

23  the time or the amendment or disclosed what they knew

24  back then when they already asked for this additional

25  time.  But if you look at their motion in 24, at

1  paragraphs 3 and 4, you can see the documents that the

2  experts provided.

3         ER 04 to 204 I think, and right above that is a

4  P-L-I-V or Plivo Production.  So it's not just

5  Mr. Schmitendorf who is involved in possessing a cell

6  phone and saying what's on his cell phone, and it's not

7  just Juicy's involved in posting the text messages and

8  sending text messages through the use of our platform,

9  there's a third third-party provider in Plivo.  So

10 there's this added level of speculation.

11        And Your Honor is right I think to not understand

12 exactly the nature of Juicy's claim but I don't

13 understand it, either.  So there's -- I mean even the

14 amended -- the proposed amendment isn't very clear.

15        I don't think it is a negligence claim, I think it

16 is an indemnity claim.  But there is a third-party that

17 is involved in this process that's been omitted, just

18 like the contract that is being ignored, just like the

19 nature of the business relationship that's being ignored.

20 Everyone who is involved in this transaction is being

21 ignored.  But at the end of the day, the way I answer

22 your question, no, we're not responsible is because I am

23 going off the Terms of Service and whether Juicy signed

24 those Terms of Service, which we know they didn't and now

25 after all this time they admit that they didn't, I have

1  got their two principles, one of whom signed the

2  contract, the other of whom owns the business, that says

3  that they are operating under the Terms of Service.  And

4  they accept responsibility for everybody -- for

5  everything they're complaining about in a negligence

6  claim.

7        So I -- I -- I can speak with a level of

8  confidence as to why there isn't a duty and I can speak

9  to the level of confidence that Your Honor's concerns

10 about the speculative nature and the factual basis for

11 the claim, you're hitting pay dirt with that, too.  But I

12 immediately went to damages, the elephant in the room on

13 damages, to show that I'm seeing a total disconnect there

14 as well.

15       I see this not as a negligence choice of law

16 claim.  If it was choice of law, it would be California,

17 because it is a California company, and California

18 contract, and California platform, and a California

19 telephone number, and California allegations so you're

20 correct that it is California.  But in terms of the

21 claim, they don't have a negligence claim.

22       It takes you to a binary choice.  It is either a

23 contract, and they lose on the contract, or there is

24 something else.  And they don't have that something else.

25 They either have no basis to plead the negligence claim,

1  not to mention the negligence claim is untimely, they

2  knew about its basis since the moment the complaint was

3  filed, they knew about its basis when they came in and

4  asked you for more time, they knew about its basis before

5  they brought us in as a party. We didn't come in until

6  June.

7        So they -- there isn't a grounds to grant the

8  motion for leave to amend. It ought to be denied. And

9  that takes you back to the motion to dismiss and those

10 claims ought to be denied without leave to amend.

11       THE COURT: Okay. Thank you.

12       So, Mr. Schmitz, it looks like Mr. Woods is saying

13 that you know you got disconnect all over the place and I

14 will say that you know as I read the briefing altogether

15 I was concerned about whether or not there was a

16 contract, you know where the duty lied because your

17 contract that you really and truly have, that they really

18 and truly had was with Chronic you know and then just the

19 various reasons that Mr. Woods is stating here.

20       And it does kind of feel like because you don't

21 have the contract claim you know that negligence is just

22 you know the -- what's left in the kitchen sink you know

23 with this. And so I just -- I just don't know, you know.

24 I mean I wanted to hear from you folks just to kind of

25 help me kind of understand this.

```
 1        So in essence you know, Mr. Woods is arguing that
 2  even if you had -- you know, even if you amended the
 3  complaint to have a negligence you know -- for the
 4  negligence claims, that it's futile anyway because there
 5  was no duty.  So I mean what -- I mean how do you -- how
 6  do you get me out of that?
 7        MR. SCHMITZ:  Certainly, Your Honor.
 8        So I'm going to focus -- focus on the futility
 9  argument right now.
10        THE COURT:  Yeah.
11        MR. SCHMITZ:  And I just want to put a pin to
12  the timeliness argument for the first time in it seems
13  like now they're arguing timeliness, I do want to come
14  back to that so I'm not --
15        THE COURT:  Sure, that's fine.  And I also
16  recognize that you know, in -- in determining that you
17  know who gets the look in the light most favorable so I
18  mean I do you understand that but -- but it does -- you
19  know, it does seem like you know you're trying to get
20  what -- where you can and in a creative way.
21        MR. SCHMITZ:  So I think that to really play
22  this out I think we need to take a step back and look at
23  what is the futility analysis that we're here about.
24  It's not a motion for summary judgment, it's not trial.
25  It's 12(b)(6).
```

1           THE COURT:  Right.

2           MR. SCHMITZ:  Contract is not pleaded in the

3 four corners of --

4           THE COURT:  Mm-hmm.

5           MR. SCHMITZ:  -- the first amended -- the

6 proposed first amended third-party complaint and so from

7 the perspective of do contractual provisions operate to

8 bar?  We can't consider that.

9           THE COURT:  Because -- well, not only that,

10 because there is no contract.

11          MR. SCHMITZ:  Right.

12          THE COURT:  Written contract anyway, right?

13          MR. SCHMITZ:  And I think that that's -- that

14 would be a likely accurate statement.  Again based on

15 what we have been able to determine.

16          THE COURT:  What about the implied nature that

17 you know -- that you seem to think that there's not a

18 written contract but you know this Terms of Service, you

19 know -- you were subjected to the Terms of Service.

20          MR. SCHMITZ:  Sure.  So on that point the -- the

21 basis of what EyeRate is arguing is pointing to

22 deposition testimony from Zach Kirby and Kyler Lundgrin.

23          I was doing some quick control left searches in

24 those transcripts and obviously I haven't had -- I am not

25 having had that I could not find the portions of that he

1  is referring to.  It may well be that that is in there

2  but things that he's mentioning that they're saying, they

3  said we did this, they accepted the Terms of Service and

4  the responsibility, doing control left searches for

5  things like "terms, responsibility, service," I didn't

6  find that discussion, either of them.

7       I'll have to look at the -- look back to the brief

8  that they filed to see if they are citing to specific

9  portions and where they're citing to.  I'm just making

10 note of while I'm sitting here doing Control F, I didn't

11 see that.

12      Even if it is there, though, it is not in the four

13 corners of the proposed third-party -- proposed amended

14 third-party complaint.  Four corners of the proposed

15 amended third-party complaint are EyeRate -- or Juicy's

16 had asked EyeRate to send one text message.

17      EyeRate in turn told Plivo, the third-party

18 company that it white-listed to actually have the

19 dissemination goes to Plivo multiple times.

20      As we pleaded in the bounds and the four corners

21 of the proposed third-party complaint it is scatter shot.

22 Some people in the Plivo data file were sent the text

23 message two times.  Others got it three times.

24 Mr. Schmitendorf, the plaintiff in this, got it four

25 times.

1      We're not able to figure out rhyme or reason to

2   why or how that happened but what we can tell is Juicy's

3   clicked the button once.  EyeRate told Plivo a bunch of

4   different numbers.  And Plivo sent it out.  That EyeRate

5   to Plivo, that is where the claim arises.  EyeRate is

6   taking the position we're not the ones that sent the text

7   message because Juicy's is the one that goes into their

8   platform, clicks "upload", clicks "send".

9      That doesn't answer the issue of EyeRate clicked

10  -- or Juicy's clicked a button once and it got sent two,

11  three, four, however many times.

12      THE COURT:  So even if EyeRate didn't do it,

13  Plivo did it?  And EyeRate had controlled over Plivo.

14      MR. SCHMITZ:  The -- as I understand things

15  right now, the ultimate sending was done by Plivo at the

16  direction of EyeRate.

17      THE COURT:  Okay.  That's what --

18      MR. SCHMITZ:  And the direction of EyeRate as

19  based on the data file we received -- that was obtained

20  from Plivo is varying numbers.  So, again, some people

21  got two, some people got three, some people got four; it

22  varied.

23      THE COURT:  So that's in on Page 4 of your

24  proposed -- you know, the -- well, your motion for leave

25  to amend?

1          MR. SCHMITZ:  Correct.

2          THE COURT:  Okay.  Gotcha.  And that's -- that

3  is why we had colloquially said, again, without

4  consenting, the petition itself, number one, that's on

5  us; two plus, that's on you.

6          Because it's a perfectly good file with a bunch of

7  different phone numbers, bunch different recipients who

8  got a varying different amount of time.

9          We hadn't attached the actual twin file to the

10  pleading, obviously to preserve privacy for those unnamed

11  putative class numbers.  More than happy to provide the

12  Excel file to your chambers if you want to look at it

13  both for the EyeRate data and for the Plivo data.  And so

14  ultimately the ultimate breach, whether it is in the lens

15  of a contract of a negligent performance of services,

16  which economic loss doctrine cases say that is still a

17  negligence claim, or whether it's, Throw the contract out

18  the window, we've just got standalone negligence, you

19  sent it more times than you had been asked to, that's

20  where our claim ultimately rests.

21          And, again, that is as to the -- how many times

22  did you send it aspect.  We have got the other part of

23  the failure to describe and failure to sell Juicy's,

24  Here's the people who opted out, or much less anyone

25  opted out.

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    42

1          As to some of the --

2               THE COURT:  Let me just stop there just a

3   minute.

4          And so, Mr. Woods, I mean I'm starting

5   to -- Mr. Schmitz is starting to bring me around but it

6   just you know -- I mean why wouldn't we permit the

7   amend -- the amendment for the negligence claim?

8          I mean I -- I mean I hear your arguments that you

9   make and I -- I'm wondering you know I mean obviously

10  you've got the Rule 12 motion that's -- that's there and

11  I know that should the Court permit this amendment, that

12  would in essence throw a monkey wrench into your Rule 12

13  claim but I mean if -- you know if at the end of the day

14  you know there is a question of whether or not who had

15  access to the platform to send the messages and you

16  weren't given permission to give it, and it wasn't you

17  because it was Plivo, who you have access to and not

18  Juicy, I mean why wouldn't -- why shouldn't a jury hear

19  information about whether or not there was a duty and

20  whether or not -- whether or not there was a negligence

21  claim?

22          I mean because you -- I asked, did you send -- did

23  EyeRate send the text?  No.  Okay.

24          And I agree now listening to you folks that

25  EyeRate didn't but Plivo did, but you have the access to

1  Plivo and you had the numbers to provide to Plivo

2  so -- so sort of maybe you did.

3       MR. WOODS:  I -- I'm troubled by a few things,

4  Your Honor, to answer.

5       First of all, this isn't the same negligence claim

6  pled, this is an entirely different case and I don't know

7  why --

8       THE COURT:  Mm-hmm.

9       MR. WOODS:  -- Plivo isn't the -- they sent the

10  text messages.

11       THE COURT:  And that's what I was scared of.

12       We wouldn't -- if Plivo was mentioned I'm thinking

13  that I'm going to be looking at another request to amend

14  to add them in and I just don't want to -- I don't think

15  that that is all that necessary but because you have the

16  information, I can see how perhaps you were added in you

17  know I mean I can see that and really and truly so can

18  you.  I mean you've got some creative arguments to make.

19       But the question for the jury is going to be you

20  know who sent these additional text messages and at whose

21  direction?  And was it -- was it negligent or not to go

22  to take the proclivities to do the additional ones?  And

23  Juicy's Vapor is saying they didn't, you did it through

24  Plivo.

25       So why shouldn't there be in a -- you know looking

1  at it in the light most favorable you know and you know

2  Mr. Schmitz's argument about within the four corners, you

3  know within the pleadings which the -- which the Terms of

4  Service are not, why wouldn't --

5          MR. WOODS:  For one, because through the

6  deposition testimony they know what the duties were and

7  they know that we didn't take on the responsibility for

8  the text messaging and that Juicy's would be responsible

9  for the text messaging.  I also think we're --

10          THE COURT:  But isn't that a question that the

11 jury should decide?

12       Why should I preclude that and preclude the jury

13 from making that decision?

14          MR. WOODS:  Because based on what he knows, that

15 Plivo sent the text message, they should have named Plivo

16 the defendant.  And even if --

17          THE COURT:  Okay.

18          MR. WOODS:  Even if they did make Plivo the

19 defendant, there would probably be some other lawyer

20 standing here in front of you saying that it is still an

21 indemnity claim.  And indemnity only arises out of

22 contract, which they don't have --

23          THE COURT:  Mm-hmm, mm-hmm.

24          MR. WOODS:  -- or equity.

25          THE COURT:  Which --

1          MR. WOODS:  And had they acted equitably that

2    would -- that might be an entirely different story.  But

3    the fact that they knew they needed a written contract in

4    order to use these services, that's bad enough but then

5    they came in and they used the services and they say that

6    the services are for something they're not, and that

7    they're not responsible for any of this.

8          So the duty still has to come from somewhere if

9    you're buying that this is a negligence claim and

10   it's -- because, I'm sorry, it will be a difference of

11   opinion I suppose, but it's not a negligence claim, it's

12   an indemnity claim, and they have the wrong defendant.

13         But if they have the right defendant they still

14   need the duty and they still need the damages or they do

15   not have a claim.

16         THE COURT:  Mm-hmm.  Okay.  Okay.  Thank you.

17         So I'll let -- you know I stopped you kind of in

18   the middle but -- but you know, Mr. Woods, you know he

19   says you know, I read, why not Plivo?  I mean you now

20   know who sent it.  You've known since June who sent the

21   additional text messages so why -- why EyeRate?

22         MR. WOODS:  I think that one of the comments you

23   made a moment ago hits the nail on the head at whose

24   direction.

25         THE COURT:  Mm-hmm.

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    46

1          MR. WOODS:  Plivo just did what EyeRate told

2    them to.

3          Yes, as far as we can tell at the moment EyeRate

4    -- or Plivo is the one who actually was the vehicle for

5    the text messages being delivered to the service

6    providers for ultimate delivery to the end-users here,

7    Mr. Schmitendorf, and all the other members of the

8    proposed class.  They were doing it at EyeRate's

9    direction.

10         And Juicy's doesn't have any direct privity with

11   Plivo and, again, since Plivo was simply doing what

12   EyeRate told it, Juicy's never told Plivo, Send any text

13   messages.  So I'm a little -- like trying to figure out

14   how we would plead a claim against Plivo.  But if we

15   assume for a moment that we are able to successfully

16   plead a claim against Plivo, given that at whose

17   direction point that you made, strikes me that Plivo

18   would then fourth-party EyeRate in.

19         Saying, EyeRate, you're the ones that told us to

20   send it two, three, four, however many times.  I think it

21   again circles back to what we have been saying.  Again,

22   without seeing the petition, text number one, that's on

23   us; text two, three, four, EyeRate, you're the one whose

24   direct -- at whose direction these text messages were

25   sent.  Even if EyeRate didn't have its fingers on the

1  keyboard for the sending itself, so to speak, EyeRate is

2  the one who initiated the text messages and that's -- and

3  that's text messages two plus.

4       As to some of the real other issues with regard

5  to -- I think I need to touch on some of the timeliness

6  issues because I think that that --

7       THE COURT:  I don't think that there's a delay.

8  I don't think that there -- I mean you can touch on it if

9  you want to but I don't think there was undue delay.

10       MR. SCHMITZ:  Okay and the one thing I wanted to

11  say on this with regard to this is on counsel's argument

12  with -- about the April 18th expert's report, it sounded

13  to me like he was insinuating that that was our expert

14  and it wasn't.  That was plaintiff's expert.  April 18th

15  is the first time we received that expert report and

16  that's the first time that we understood the role that

17  Plivo plays in all of this.

18       Plaintiff had subpoenaed Plivo.  I don't know how

19  plaintiff found out that Plivo was involved.  I believe

20  that it was by coordinating with EyeRate and EyeRate gave

21  them that but I don't know for sure.  That -- candidly,

22  that is speculation on my part.

23       We didn't tell them Plivo because we didn't know

24  who Plivo was.  We just got the documents in from Plivo

25  and April 18 is when we were like, okay, now I understand

1   Plivo's role.

2          As to whether we call it indemnity, whether we

3   call it negligence, the rules require the claims to be

4   construed as to do justice.  We think it is a negligence

5   claim.  They think it's an inequitable indemnity claim.

6   If we construe this inequitable indemnity claim I don't

7   know how we can under the lens, the standard through

8   which we have to evaluate futility analysis, I don't know

9   how we can make a conclusive determination that the

10  proposed --

11         THE COURT:  You can't because there's no written

12  contract.  You -- right?  That's what Mr. Woods said.

13         MR. SCHMITZ:  As to if it was contractual

14  indemnity yes.  As to an equitable indemnity --

15         THE COURT:  Okay.

16         MR. SCHMITZ:  -- I think his understanding of

17  the ultimate negligence claim is he calls it equitable

18  indemnity, we call it negligence.

19         We construe it as equitable indemnity that has to

20  weigh the equities.  I don't know how we can, based on

21  what was pleaded in the four corners of the proposed

22  amended third-party complaint, say that a 12(b)(6) motion

23  must be granted as to an equitable indemnity claim if

24  that is what we are construing it to be.

25         On the four corners we've pleaded a sound claim

1  that Juicy's went -- said, EyeRate, send this one time.

2  EyeRate said, Plivos, send this two, three, four times.

3  That transition from Juicy's, to EyeRate, to Plivo, in

4  between EyeRate and Plivo, that's where the nexus of this

5  issue, whether we call it negligence, whether we call it

6  inequitable indemnity, that's where that falls.

7          THE COURT:  Okay.  So, Mr. -- thank you,

8  Mr. Schmitz.

9          So, Mr. Woods, I mean I think that there is no way

10 to use the platform, right, without a written contract,

11 but can user access through the Clickwrap agreement,

12 something like that, you know, on the website?  I mean is

13 there some other kind of access?

14         I mean is there a way to use the platform without

15 a written contract?  I mean I just --

16         MR. WOODS:  Not legally.

17         THE COURT:  Okay.  Okay.

18         MR. WOODS:  Which --

19         THE COURT:  But -- but was there -- this

20 Clickwrap kind of agreement, you know that kind of has to

21 be agreed to when someone uses your platform to send out

22 the texts?

23         MR. WOODS:  No.

24         THE COURT:  Okay.  Okay.

25         MR. WOODS:  It's -- the -- the Terms of Service,

1 getting back to the duty, that Mr. Kirby and Mr. Lumberg

2 or Lundgrin were operating off of said everything that I

3 detailed earlier but it detailed another point.  That

4 the -- the user under the contract in the Terms of

5 Service, in this case Ponca City Dispensary, D/B/A

6 Chronic Co, cannot provide access and use the platform

7 for any other business without the prior express

8 agreement in writing of my client.

9         THE COURT:  Mm-hmm.

10         MR. WOODS:  So we can -- I don't think there is

11 a contract.  And I don't like it being said that I think

12 there was one.  There wasn't.

13         But the point was, we've gone further than that

14 because there has been discovery in the case and I have

15 Juicy's principle's deposition transcript that explains

16 that they knew the Terms of Service, actual notice, they

17 were on -- they had actual knowledge, they had actual

18 notice, and they went ahead and used that platform in a

19 way they knew they weren't allowed to use it it is kind

20 of what got us to the whole trespass thing, right?

21         THE COURT:  Mm-hmm.

22         MR. WOODS:  But is that foreseeable, and do you

23 owe a duty?  We don't owe a duty.  And I'm not saying

24 foreseeability, I suppose under negligence, people owe a

25 duty to trespassers but it's a very specific duty that

1  you're not going to do malice or intentional harm to you

2  know put up a snap gun or whatever it is at your front

3  door that gets the intruder that comes in, and that's not

4  what we are talking about here.  That hasn't been pled,

5  it can't be pled.

6        So I just keep coming back to the duty but it

7  needs to be kind of elucidated or it needs to be thought

8  of in terms of not just the admission after all the times

9  we don't have a contract, but we're not looking at the

10  detail of the depo transcript, and the depo transcript,

11  it's document 57-1.

12            THE COURT:  Got it.

13            MR. WOODS:  Page 16 of 18.

14            THE COURT:  Mm-hmm.

15            MR. WOODS:  And lines 10 through 20 are the

16  lines where there's an answer from Mr. Zach Kirby, I'd

17  represent, saying that he is operating within the terms

18  and conditions.  Now I happen to know that all that you

19  need to do is read the terms and conditions to see that

20  Mr. Kirby has it wrong.  You just look at the four

21  corners of it and he has it wrong what the terms and

22  conditions say but that's not the point.

23        The point is that he knew the terms and conditions

24  existed and he knew that they were ours and he contends

25  that he read them.  Whether he remembers them accurately

1  in his deposition or not isn't the point.

2       So that is -- that is the scope of the duty and

3  it's why they don't have a claim.  It's why Juicy's Vapor

4  Lounge does not have a claim against my client.

5       THE COURT:  Okay.  Mr. Schmitz, anything

6  further?

7       Thank you, Mr. Woods.

8       I mean every -- I mean were -- I mean I'm still

9  shaking my head, I mean you and I are but Mr. Woods is

10 not.  Mr. Woods seems you know pretty certain that you

11 know you can't really make the claim that you know that

12 EyeRate instructed Plivo to do this, you know you

13 just -- he is saying that -- because I mean I don't know

14 how Mr. Woods can say that you know -- can send or

15 instruct that the text messages be sent and then turn

16 around and say that they don't have a contract with

17 Juicy's, rather they have one with Chronic.  And I don't

18 think that's what he is saying.  I am saying I think that

19 he is saying that even -- you know, even if we put that

20 aside, the claims that you're making for negligence you

21 just -- you can't -- it is futile.

22       You know you don't have damages, you don't have

23 harm.  Even if we looked at economic -- you know,

24 whatever law we looked at, all the way around you don't

25 have -- it's futile that you even let them send them down

1  that street.

2      MR. SCHMITZ:  Sure.  I think that the kind of

3  difference in the places of where our arguments have been

4  and I think that I'm starting to understand how -- where

5  the -- some disconnect, and it may have been on my part

6  is, is I believe EyeRate is attacking the length between

7  Juicy's and EyeRate, whereas before it had seemed like

8  they had been attacking the link between EyeRate and

9  Plivo.

10      And so as to -- with regard to the link between

11  Juicy and EyeRate as to damages it is a third-party claim

12  that is inherent --

13      THE COURT:  Got it.

14      MR. SCHMITZ:  -- and if we require damages have

15  already been incurred to plead it, the third-party

16  practice goes away, it would entirely moot the entirety

17  of Rule 15.

18      As to the implication of the contract and things,

19  I think that there is -- it's where we kind of get into

20  the disconnect between the "issers", and is there a

21  contract, and the equitable issues.

22      And so one thing that I'm trying to -- to think

23  through as well right now is if we take a step back, one

24  of the issues is *Guitterez*, was it Chronic Co that said,

25  Hey, EyeRate send these text messages or was it Juicy's

1  that said it.  If we pause for a moment and delete

2  Juicy's from our mind and it was Chronic Co that hopped

3  on the platform, Chronic Co that said, EyeRate send this

4  text message one time, EyeRate still said -- still says,

5  Plivo send it two, three, four times, is there a claim

6  then?

7        And I think that that -- understanding that

8  dichotomy, that distinction I think helps us dispel

9  EyeRate's arguments for two reasons.  Number one,

10  ultimately, those arguments are equitable which can't be

11  decided at a 12(b)(6), pleaded or otherwise, and number

12  two, it's not pleaded.

13        And so I think that some of the arguments he's

14  making about the deposition testimony that he is citing

15  here, I think that that ultimately feeds into at most

16  that any equitable determination that we're going to have

17  to make at a later date.  What did Juicy's understand?

18  What did Juicy's believe?  How did that fit in?  You ask

19  questions, is there a Clickwrap?  You ask was it a

20  Browsewrap instead?  And how that impacts the notice and

21  the intent and all of those.

22        There's also a question, ECF 35-1.  Is this the

23  terms that would have been put forth?  And this is where

24  I mentioned a few moments -- more than a few moments ago,

25  it was probably a half hour or so by now, that there's a

1   fair amount of background that I'm ready to give about

2   Juicy's searches for the contract.

3           THE COURT:  Mm-hmm.

4           MR. SCHMITZ:  And one thing I've got to point

5   out, the document, ECF 35-1, starting at page, I believe

6   5, where you start with the Terms of Service, Terms and

7   Conditions.

8           THE COURT:  Let me get it up.  Let me get it

9   back up.  35 dash -- and that's the contract, right?

10          MR. SCHMITZ:  That is the document that EyeRate

11  has put forth contending that that is the contract.

12          THE COURT:  What page?  So it is the Chronic Co,

13  Oklahoma.

14          MR. SCHMITZ:  Yes.  And so starting at page 6 --

15          THE COURT:  Six of 16?

16          MR. SCHMITZ:  Correct.

17          THE COURT:  Okay, 6 of 16.

18          MR. SCHMITZ:  The last page there, March 15th,

19  2022, we have not been able to verify the existence of

20  any March 15th, 2022, Terms of Service.

21          We have looked -- a lot of companies will have

22  like a archive of historical Terms of Service.  If

23  EyeRate has one we haven't been able to find it on their

24  website.

25          When the plaintiff served us different documents

1   on EyeRate, EyeRate did produce copies of a Terms of

2   Service but this wasn't it.  The document that EyeRate

3   produced was a June 28th, 2022, Terms of Service after

4   all of these texts and all this involvement had ended.

5        All the texts that we're dealing with were in May.

6   And I do have a copy of what EyeRate had produced.  The

7   Bates numbering on that is ER 212 through 219.

8        And so when we had asked our client, We need to

9   get a copy of any contract you've got with EyeRate,

10  looking through things they would have seen this -- the

11  first few pages of ECF 35-1 doesn't have Juicy's name on

12  it.  We looked at that.  This isn't Juicy's, this must be

13  Chronic Cos, I am looking for something else.  We are

14  done with the search and didn't find something with

15  Juicy's name on it.

16       So it may well be that this is accurate that this

17  is the correct Terms of Service that were in effect March

18  15th, 2022.  It may well have been the Terms of Service

19  that were in effect in April 2022, the date of that

20  Chronic Co agreement that's the first few pages of ECF

21  35-1 but what we have been given, I have no way of

22  verifying that.  I have no way of challenging that.  We

23  haven't gotten to the discovery on that to ascertain,

24  among other things, Clickwrap versus Browsewrap, is this

25  actually what was up there?  And a variety of other

1  things.

2       And to that point, the form, both literally the

3  format, the way that the terms are laid out, and the

4  substance of the terms in the March 15th, 2022, which is

5  ECF 35-1 beginning at page 6, is different from the June

6  28th, 2022 that was what EyeRate produced in response to

7  the subpoena.  It's a different layout.  They don't have

8  the same numbering system that they have got.  The

9  substance of the terms that is different.  And so

10 I -- we, frankly, have a lot of questions about this.

11 Again, it may well turn out that they're correct on this.

12 But I can't as I stand here today concede that point

13 right now because we have just too many questions about

14 the document that's been put forth.

15      Dating back to January, we were -- our office was

16 having conversations with Mr. Woods and EyeRate and

17 EyeRate raised the contention, There's no contract with

18 Juicy's.  We responded saying, Okay, give me what you've

19 got and they refused.  Part of the basis of their

20 refusal, Mr. Woods said, is that the contracts that

21 EyeRate has had a confidentiality provision.  That was

22 why he refused to give it.

23      ECF 35-1 does not contain the confidentiality

24 provision.  The closest it comes is references to a

25 defined term "confidential information" which is

1  ultimately dealing with, essentially the trade secrets of

2  the platform itself, and like phone numbers, the content

3  of text messages that's being provided.

4      So, again, we have a representation in an email

5  that I have got printed out that I an show you that says

6  we have a confidentiality provision, we have a subpoena

7  production that's a different document, and they are

8  attaching yet a third document that doesn't match the

9  first two.  It may well be that this is accurate.

10      THE COURT:  But and so if it is, what would that

11  do?  Would that -- would that -- I mean, would your

12  position be different with regard to adding the

13  negligence claims because I mean I'm not worried about

14  the contract.  I mean I'm not -- I'm worried about

15  meeting the -- you know just to determine if -- if you

16  know the futility nature of a negligence claim, and I'm

17  still struggling you know in all that you're saying, I'm

18  still struggling with the foreseeability aspect and so

19  that's to me --

20      MR. SCHMITZ:  So I think on the foreseeability,

21  the point where I made of like let's assume it wasn't

22  Juicy's, that it was Chronic Co sitting in the chair --

23      THE COURT:  Mm-hmm.

24      MR. SCHMITZ:  -- and everything else happened as

25  played out, the foreseeability -- we wouldn't be asking

1  is it foreseeable it is going to flow through Chronic Co.

2      The analysis is always it is foreseeable the harm

3  to the end recipient?  Whether it is uses Juicy's or

4  Chronic Co sitting in the chair or someone else.

5          THE COURT:  Like Schmitendorf.

6          MR. SCHMITZ:  The end recipient is the

7  foreseeability that we have to focus on.

8          THE COURT:  Mm-hmm.

9          MR. SCHMITZ:  And when -- when EyeRate receives

10 a request, Send this text message one time and then

11 EyeRate sends it two, three, four times.

12         THE COURT:  Or Plivo.

13         MR. SCHMITZ:  EyeRate tells Plivo.

14         THE COURT:  Got it, got it.

15         MR. SCHMITZ:  I'm keeping it short for

16 efficiency.

17     EyeRate receives a request, Send this text message

18 one time.  EyeRate tells Plivo to send this out, it is

19 who they use to send it out, send it two, three, four

20 times.  It has to be foreseeable.  There is no way

21 EyeRate doesn't see harm to the end-user when they are

22 sending a text message multiples of times that they

23 received a request, regardless who have that request came

24 from.

25         THE COURT:  Okay.  Hold on.  So okay.

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    60

1   Mr. Woods, you know, I mean if -- you know, if

2 what Mr. Schmitz says is true you know they say one time

3 for a reason and I -- I remember writing a note, I mean

4 they said one time for a reason.

5   And if you understood, and maybe there's a

6 question about whether or not you know EyeRate or Plivo,

7 or whoever, understood what "one time" meant but I think

8 that be for them to say, one time you know, send one

9 text, one time, they say that for a reason, which makes

10 it if you understand that, foreseeable that if you send

11 additional ones I mean that's not a -- that's not a big

12 leap to take.  Right?

13   So you didn't understand or you -- you know,

14 EyeRate or Plivo didn't even have the one time

15 conversation or you don't know or what?

16   MR. WOODS:  No, I do know, Your Honor, there

17 would not have been a one-time conversation.

18   THE COURT:  Okay.

19   MR. WOODS:  And I -- and I am bothered by just

20 how far afield we're getting in some of the assumptions.

21   And we've been around for how long?  They knew who

22 their vendor was.

23   THE COURT:  Yeah, but it is foreseeable, I mean

24 was it foreseeable?  That's all I want -- I mean I

25 understand all this other information but --

1    MR. WOODS:  Right, I -- I get it, Your Honor,

2  but he never did any discovery.  And we wouldn't be here

3  right now if there wasn't delay and now we're dragging my

4  client along this stream based on speculation and

5  statements about what was produced and what wasn't

6  produced because somebody else had the gumption to send

7  my client a subpoena.  So -- so you know this delay in

8  waiting until --

9    THE COURT:  What delay?  I mean it's been since

10 June.  You don't have a trial date.  You've got a motion

11 to dismiss pending that's at the beginning of the case.

12 Where's the delay?  Really and truly in the full scheme

13 of things, where is the delay?

14    MR. WOODS:  One of -- one of the delays being

15 that they deliberately pled the breach of a contract that

16 they knew doesn't exist and it took this many months and

17 flying 2100 miles to get the concession that it doesn't

18 and that is delay.  And I'm struggling to find the excuse

19 for that.

20    And why Juicy's would have filed a contract in

21 their files that they just admitted doesn't exist because

22 they don't have a contract with us, I don't understand.

23 Why we are talking about foreseeability through Clickwrap

24 and browser ap agreements and what we agreed to do, that

25 distinction between Clickwrap and browser wrap and is

1  whether when you are looking at a contract and you are

2  looking at Terms of Service, do you click through to

3  understand the Terms of Service exists, and that's what

4  you're operating under you're being bound to.

5       Kirby admitted to it in deposition that he knew

6  what the Terms of Service were and that he was bound to

7  it.  We are getting in to all these issues about us

8  giving an instruction to Plivo that there is just this

9  acceptance that that was done when it wasn't.

10  There's this --

11       THE COURT:  So who else would have given it to

12  Plivo?  Who else would have given the instruction to

13  Plivo to click -- to send a couple more text messages?

14  Who else?  I mean who else could have done that?

15       Did Juicy's have or Chronic have the wherewithal

16  to do that?

17       Who else could do it?

18       MR. WOODS:  I think -- I think, Your Honor, the

19  way that it works --

20       THE COURT:  Mm-hmm.

21       MR. WOODS:  -- is that my client is an

22  information aggregator.  So you put your information in

23  and it goes to a platform.  It gets aggregated.

24       So just, by way of example, when you have a

25  complaint, the artwork you know like Juicy's Vapor, you

1  see a logo on top.

2            THE COURT:  Mm-hmm.

3            MR. WOODS:  The artwork, the text, the timing,

4  everything is put in by the user.  They just put it into

5  our platform.  And they hit send.

6            THE COURT:  The "user" being --

7            MR. WOODS:  The "user" being -- well, in this

8  instance Juicy's evidently, although there wasn't an

9  agreement for that, should be Chronic Co.  Okay?

10           And the hypothetical that, well, what if Chronic

11  Co substituted the name you know Juicy's for Chronic Co,

12  well, then Chronic Co may have a claim for breach of

13  contract, it may have a claim for indemnity or equitable

14  indemnity, but that's not Juicy's.  And Juicy's was

15  operating with actual knowledge that we are not

16  responsible for the things -- we don't take on the duty

17  for the things that Juicy wants to hold us accountable

18  for.

19           And on the issue of foreseeability -- well, let me

20  answer your question.  Your question was how do these

21  things work?  And Juicy's appears to know more than I do

22  about how it works because you upload the information and

23  we are not a text messaging platform.  And all of these

24  companies, whether it's EyeRate or whether

25  it's -- whether it's Plivo, they would akin themselves

1  more like a Verion.  You know you type in your text

2  message and you create it and if there is something

3  illegal about it, harassing about it, that is on you and

4  then you hit "send" so there's a platform that you use.

5  But the platform provider really has nothing to do with

6  the actual sending and the intent behind the message

7  going out.

8        What happens in this instance is that the only

9  interaction that my client has with the platform is

10 knowing that it can know if given the instruction that

11 one text went out.  We have to be able to know to bill

12 for the fact that somebody used the platform but we don't

13 give an instruction to Plivo.

14       I believe -- and there's no basis for this belief

15 but it's what I am putting together through what's being

16 argued by Juicy's, I know that you go on the platform, I

17 know we aggregate the information, I know that the user

18 of the platform hits "send".  I know that hitting "send"

19 creates the ad that the user wants and that the user

20 understands from the Terms of Service that it is the user

21 sending the text message.

22       Whether it's -- whether the text message that goes

23 out from Plivo goes out one time, goes out four times, I

24 don't know.  And I don't know what the action or activity

25 is on Plivo's end that actually makes the text message go

1  out.  Don't know that; I don't purport to know it at this

2  point.  What I know is that my client doesn't send out

3  text messages and I know that that's the reason why we

4  have Terms of Service where the parties agree, and

5  everybody understands if they just read our Terms of

6  Service, that we don't send the text messages, we won't

7  be responsible for the sending of the text messages, the

8  user will.

9      So foreseeability I think puts the cart before the

10 horse because foreseeability is the scope issue, it is

11 the scope of the duty, right?  First -- that was your

12 first point this morning, Your Honor, how do we establish

13 the duty?  Whether or not the harm was foreseeable?

14 There is no duty.  There is no --

15      THE COURT:  Especially under California law.  If

16 that's what you contend the choice, right?

17      MR. WOODS:  Right.  Right.

18      THE COURT:  Okay.

19      MR. WOODS:  And I also think -- I don't know and

20 I thought I heard that I don't know that on that point

21 Kansas would really be any different.

22      THE COURT:  Right.  Right.

23      MR. WOODS:  So that's -- that's my point there

24 that I think in the discussion we're getting ahead of

25 ourselves.  We just need to keep to the fundamental

1  question.  What was this business relationship?  And --

2          THE COURT:  But you don't need that you know for

3  a negligence claim, right?  I mean you don't need a

4  relationship, I mean do you really and truly in a

5  negligence case?  I mean in a contract case I understand

6  but if -- if -- we should be done talking about the

7  contract because you don't care if the contract claim

8  goes away and Mr. Schmitz wants it to go away.

9          So I really want to focus on you know the fact

10  that -- you know, Mr. Schmitz, you're going to have a

11  hill to climb because I am struggling to see I mean

12  I -- there's a question about whether or not there's a

13  duty between you two, I get that.  But I am struggling to

14  see the foreseeability aspect and I'm really trying and

15  I -- you know, it has to be I think with a specific

16  plaintiff that we have not just vague foreseeability to

17  someone and I just -- I'm not -- I'm not there.  I mean I

18  need to go back and listen to all of this but that's

19  going to be your hill the way I see it.

20          Mr. Woods.

21          MR. WOODS:  Your Honor.

22          THE COURT:  And then I am going to close with

23  Mr. Schmitendorf.

24          MR. WOODS:  Understood.  And thank you for the

25  indulgence.

1           And I guess when I go back to the cases, like

2    *Minter*, and it's not just the issue of timeliness, that's

3    not what I am getting at.  *Minter* I think stands for this

4    proposition that it's not just a motion to dismiss where

5    you're looking at the facts pled in the complaint as true

6    and you're giving that deference.

7                THE COURT:  Mm-hmm.

8                MR. WOODS:  *Minter* is talking about being able

9    to take from outside the complaint and look at other

10   factors that bear on the motion for leave to amend to

11   determine whether or not leave to amend is going to be

12   granted.  So I think what the focus has been here today

13   largely is, yeah, the fundamental question of whether

14   there is a duty and then whether the duty is foreseeable.

15   Whether the harm is foreseeable, excuse me.

16               THE COURT:  Mm-hmm.

17               MR. WOODS:  That -- those are correct general

18   principle -- principle statements of the law.  They're

19   generalized.  But that's not where we are right now.  We

20   have information in the form of the deposition

21   transcripts and the knowledge of the principles who

22   operated in this business relationship and --

23               THE COURT:  But if you look at futility, though,

24   in this context you've got to look at it as Mr. Schmitz

25   said, you know, and then within the -- within the

08/28/2023    SCHMITENDORF v. JUICY'S    22-2293    68

```
1  pleadings.  And these are not.  You know, the
2  deposition's not in the pleadings, nor is the Terms of
3  Service.  And so you have to look at it in a Rule 12
4  context and even if we go to Rule 15 you know I still
5  have to consider futility in that same vein, right?
6        MR. WOODS:  I -- I think other things can be
7  considered when looking at the issue of futility or
8  looking at the issue of bad faith.
9        THE COURT:  Well, I don't see any bad faith.  I
10 don't see delay.  I'm not sure that I agree that there's
11 prejudice.  You know I mean above and beyond you know.
12        MR. WOODS:  Yeah.
13        THE COURT:  So I mean to me the main issue is
14 whether or not it's futile.  And I think you know as I
15 sit here without having gone back to review this stuff,
16 as I said, Mr. Schmitz is going to have a hill to climb
17 because foreseeability I am not there.  And he -- I have
18 to be able to see that in order to -- to say that it is
19 not futile.
20        And I am going to go back and look at it and I
21 might you know, I mean I haven't made up my mind, that is
22 why I wanted to hear but right now I mean I'm with you,
23 Mr. Woods.
24        MR. WOODS:  I know.  It's been a long morning as
25 well.  But, no, we've covered a lot of ground so I just
```

1  appreciate you're working hard to narrow the issue and

2  get it right.

3        THE COURT:  Okay.  It's just -- I mean I'm not

4  going to text any more because of this.

5        So I'll give you the final -- you know, unless

6  Mr. Woods you know has some additional stuff that he

7  wants me to say, you know you're going to have to talk to

8  me about foreseeability.

9        MR. SCHMITZ:  Mr. Woods explained his client's

10 role a few moments ago, that they're an information

11 aggregator.  That when the user, whether its Juicy's,

12 Chronic Co, whomever, logs into their platform, they

13 input various information, they upload the flier, the

14 digital artwork, the advertisement, they click send.

15 EyeRate takes care of it from there.

16       EyeRate ensures that text message.  That

17 advertisement that they created gets sent out.  That is

18 EyeRate's role.  And it's exemplified and shown as well

19 in page 2 of ECF 35-1.  That is the invoice that's

20 reflected, the agreement, whatever you want to call it,

21 with Chronic Co.  One of the line items SMS Marketing

22 Add-on, $150 a week, $600 a month .

23       SMS Marketing is part of their business.  It is

24 one of the things that they do.  By and large, a lot of

25 EyeRate's business is facilitating contact with

1  customers.  A large part of what they do is sending

2  post-purchased surveys to people.  So if someone comes

3  in, buys something, EyeRate can sync up with the point of

4  sales system that companies use.  Juicy's as it happened,

5  the point of sales they use wasn't able to sync up with

6  EyeRate so they couldn't facilitate that but with EyeRate

7  it is standard business with companies who can measure

8  with the point of sale, someone comes in, buys something,

9  (uses onomatopoeia) EyeRate automatically sends out, Give

10 us a review, Rate your service.  We have comments or

11 questions, here is a link that you can send.  That's what

12 they do.

13        Here, there was the add-on, not only of the

14 reviews, SMS Marketing.  He described in these matches

15 what we have pleaded with matches what the testimony is

16 in the deposition.  The user logs into the portal.  Got

17 the website up.  Type in any detail like name the

18 campaign, something like that; upload the digital

19 artwork; upload an Excel file with phone numbers that

20 you're going to send it to, click send.  That's where the

21 user's involvement stops.  And here EyeRate -- or Juicy's

22 did that.  Upload additional artwork, upload an Excel

23 file, here is the list of phone numbers we want to send,

24 click send once.

25        It is handed then over to EyeRate.  EyeRate, its

1  job at that point, is to get that advertisement, in this
2  case text message with this supplier, into the hands
3  proverbial the phone of the recipient of the -- with this
4  supplier, in the hands for the phone of the recipients,
5  that Excel file with the phone numbers.
6         The way they do that we know is they use Plivo and
7  this is -- this goes back to at whose direction.  The
8  very beginning of our hearing today you noted that the
9  negligence claim is negligence slash res ipsa loquitur.
10        Juicy's handed off.  Send it one time, one time
11  only.  Somewhere along the line, EyeRate told Plivo --
12  while everything was within EyeRate's domain, it's
13  control, EyeRate told Plivo, send it two times, three
14  times, four times to various different people.  That's
15  where the foreseeability analysis has to focus.  Because
16  EyeRate's involvement, whether or not it has committed
17  harm to the end recipients doesn't turn on who's in the
18  chair.  It doesn't depend on was this Juicy's who
19  uploaded everything.  Doesn't depend on was it Chronic Co
20  that uploaded everything.
21        It's all about why did EyeRate tell Plivo, send it
22  two times, three times, four times, however many times.
23  That's the foreseeability.  EyeRate was told by whomever
24  one time, one time only.
25        EyeRate tells Plivo two times, three times, four

1  times.  EyeRate knows when it does that it was only asked

2  one time.  And it multiplies.  When EyeRate receives that

3  and then spits out something different, it's like

4  telephone -- the old telephone game when we're children.

5  At the beginning you have one word, at the end there's

6  the class clown in the middle who screws it up, usually

7  to be funny.

8         Something happened while this was in the hands of

9  EyeRate that EyeRate told Plivo, Changed the message,

10  send it two times, three times, four times.  When EyeRate

11  made that change, that's the foreseeability that we're

12  arguing.

13         Now we don't know exactly why or how it happened

14  that this change happened.  We have to get discovery for

15  that.

16         THE COURT:  Okay.

17         MR. SCHMITZ:  But the change in the

18  foreseeability arises, EyeRate was told, Send it one

19  time, one time only, and this is why I have been saying

20  colloquially without seeing the petition, text number

21  one, that's on us.  Text two plus, that's EyeRate.

22  Because EyeRate had to have been able to foresee that

23  sending more text messages than it had been asked to send

24  could cause harm.

25         As to the foreseeability, did they have

1  foreseeability as to Brady Schmitendorf specifically?

2      Yeah, there's -- they had their phone numbers.  It

3  was given -- the list of phone numbers.  Did it know this

4  phone number matches Brady Schmitendorf?  Probably not.

5      Did it need to?  No.  They know there is someone

6  getting that text message.  They know they have been

7  asked, Send this text message one time and one time only.

8  And they told Plivo something different.  That's

9  foreseeable.  The harm that flows from that, that's

10  foreseeable.  That's our argument.  That's where the

11  claim on this sending multiple times distills down to.

12      We haven't talked about the other aspects of the

13  claim, the failure to report back, people who opted out,

14  we haven't talked about the internal scrub because that's

15  been kind of in the background that we haven't really

16  talked about today so I want to make sure --

17      THE COURT:  Well, but I understand that from

18  your brief about all the things that you knew, I mean I

19  understand that everything that flows from that.

20      MR. SCHMITZ:  Sure I just want to make sure it's

21  not lost in the shuffle.

22      THE COURT:  It's not lost in the shuffle,

23  hmm-mm, it's not, I remember that from your reply.

24      MR. SCHMITZ:  As to kind of the larger issue,

25  the claim that we have really been talking the most about

1  here today, that's the flow that we see.  That's the flow

2  that we've pleaded, and that is the flow that the

3  evidence we gathered so far shows.

4      The user uploads the digital artwork, Excel file

5  with phone numbers, clicks "send" one time.  EyeRate

6  receives it.  Our business model we take care of it from

7  there.  The game of telephone happens, the message

8  changes, goes from one time to two, three, four times.

9  The harm that flows from that was foreseeable.  That's

10  our argument, Your Honor.

11      THE COURT:  Okay.  Okay.  Mr. Woods, I mean I

12  can just see you -- go ahead.

13      MR. WOODS:  No, I --

14      THE COURT:  Nothing?

15      MR. WOODS:  I think you've covered all the

16  ground, Your Honor.  You're obviously going to go through

17  the transcript.

18      THE COURT:  Mm-hmm.  Okay.  All right.  Well, I

19  hope to get a decision out, I don't know how soon it will

20  be but I just -- I needed your help with this and so

21  that's why I asked you to come because from the briefing

22  I still had questions and I wasn't sure that I was

23  tracking so I'm sorry that you know that you know you've

24  got -- you know you had to come here but I just I needed

25  your help.  I just could not from the briefing, I

1  couldn't get there so a I feel like this was argument

2  worthy.  Okay?

3       All right?  Well, I got to go back and will not

4  and figure out what I know now and then I will try and

5  get a decision out soon.  Okay?

6       We don't have a trial date but do we have a close

7  of discovery?  I was trying to look at that but then I

8  wanted to listen and so -- or was it stayed?  Or I think

9  it's stayed.

10          MR. WOODS:  A little bit of both.

11          THE COURT:  Yeah.  Okay.

12          MR. SCHMITZ:  It's closed.  And then depending

13 upon the motions that are in front of Judge Crouse now,

14 there are issues of this case being stayed or bifurcated

15 if the defendant survives the motion to dismiss, and then

16 at that point discovery potentially opening up.

17          THE COURT:  Okay.

18          MR. SCHMITZ:  So there is no question of it

19 opening for purposes of third-party pleading.

20          THE COURT:  Gotcha.  Okay.  All right.  Well,

21 then we'll be adjourned.

22       (Proceedings conclude at 12:33 p.m.)

23       ********************************************

24            C E R T I F I C A T E

25       I, Jana L. McKinney, certified shorthand reporter,

1 certify that the foregoing is a correct transcript from

2 the official electronic sound recording of the

3 proceedings in the above-entitled matter.

4        Dated this 7th day of October, 2023.

5

6                s/ Jana L. McKinney_____

7                Jana L. McKinney
                 United States Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      I  N  D  E  X
                                              PAGE
 2

 3

 4   REPORTER'S CERTIFICATE                       76

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```