In the United States District Court
for the District of Kansas
_____

Case No. 22-cv-02293-TC-GEB
_____

BRADY SCHMITENDORF,

*Plaintiff*

v.

JUICY'S VAPOR LOUNGE, INC.,

*Defendant*
_____

## MEMORANDUM AND ORDER

Plaintiff Brady Schmitendorf brought this putative class action against Juicy's Vapor Lounge, asserting that Juicy's sent him and others similarly situated unwanted text messages in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227. Doc. 1. Schmitendorf now moves to certify a class. Doc. 72. For the following reasons, Schmitendorf's motion is denied.

## I

## A

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). To meet that exception, "a party seeking to maintain a class action must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23. *Id.* (citation and internal quotation marks omitted).

Rule 23 "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A plaintiff requesting class certification "must be prepared to prove . . . in fact" that each requirement is met. *Id.* (emphasis omitted). That may require a court to "'probe behind the pleadings' and examine the facts and evidence

1

in the case." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227–28 (10th Cir. 2013) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021). Even so, consideration of the merits on a motion for class certification is limited to "determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

Rule 23(a) delineates four prerequisites for class certification: numerosity, commonality, typicality, and adequate representation. *See* Fed. R. Civ. P. 23(a). Certification is proper only if a district court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 569 U.S. at 33 (quoting *Dukes*, 564 U.S. at 350–51). If the prerequisites are met, a movant must then "satisfy through evidentiary proof" at least one of the defined classes under Rule 23(b). *Id.*

## B

Defendant Juicy's Vapor Lounge, Inc. is a retail vape shop that sells products in Kansas and Oklahoma. Doc. 72 at 1.[1] As part of its business, Juicy's operates a reward program in which it collects phone numbers from customers who purchase products at its stores. Doc. 81 at 6. When a customer makes his or her first purchase at Juicy's, a staff member asks the customer if he or she wants to join the reward program. *Id.* If the customer says yes, Juicy's creates a digital account for the customer in its internal system and stores the customer's phone number in that system. *Id.* According to Juicy's, this is the only reason it would store a customer's phone number. *Id.*

In 2022, Juicy's launched a promotional campaign seeking to reconnect with former customers. Doc. 81 at 6. It targeted customers who had opted into its rewards program but had not made a purchase in at least ninety days. *Id.* at 6, 20. It sent text messages to those customers with messages like, "It's Tuesday! You know what that means! Buy-One-Get-One-Free Juicy's Premium Juice all day long!" Doc. 72 at 1–2.

---

[1] All citations are to the document and page number assigned in the CM/ECF system.

To execute that plan, Juicy's contracted with third-party marketing platforms to send the text messages on its behalf. Doc. 81 at 3. Juicy's first contracted with the platform EyeRate to send out a text on May 3, 2022. *Id.* at 6. EyeRate used another entity known as Plivo to send that promotional campaign. *Id.* at 3–4. Juicy's then switched to the platform SlickText, which sent four subsequent text campaigns between May 6 and July 1, 2022. *Id.* at 5. Juicy's arguments against class certification also implicate the fact that, during the same timeframe, Slick-Text used the same phone number to send text messages on behalf of other entities, such as Lopes Active Apparel. *Id.* at 7. There is no evidence, however, that SlickText sent text messages to Juicy's customers on behalf of any entity other than Juicy's.

Approximately 3,500 individuals, including Plaintiff Brady Schmitendorf, received at least one text message from Juicy's. Doc. 81 at 7–8. Schmitendorf received the text messages on his cell phone. *Id.* at 7; Doc. 72 at 2. Schmitendorf uses his cell phone for various purposes. Doc. 81 at 8. He uses it to send and receive personal text messages. *Id.* He uses it for work too. *Id.* For example, he communicates with his boss and swaps shifts with his co-workers through an application on his cell phone. *Id.*

Schmitendorf replied to Juicy's with an opt-out request, asking Juicy's to stop sending him promotional messages. Doc. 72 at 2. He was not the only recipient who did this: Over five hundred individuals who received Juicy's text messages opted out of future text campaigns. *Id.* Despite these requests, the individuals continued to receive promotional text messages from Juicy's. *Id.* at 3. Their individual experiences varied though. For example, even though Juicy's asked the platforms to send five text messages, some individuals received as few as two while others received as many as thirteen. Doc. 81 at 5. In addition, Plivo's records show some messages labeled "sent," some "delivered," and others labeled both "sent" and "delivered." Doc. 72 at 2. Schmitendorf's expert, Aaron Woolfson, used Plivo's and the other platforms' records to conclude how many text messages each phone number received, relying on the assumption that the proposed class members received any of the messages labeled "sent" or "delivered." *Id.*

Schmitendorf then sued Juicy's, alleging that the unwanted text messages violated the Telephone Consumer Protection Act, 42 U.S.C. § 227. Doc. 1. Schmitendorf asserted two claims but only seeks class certification on one of them. *Id.* In that claim, Schmitendorf

alleged that he and others similarly situated were harmed by Juicy's failure to maintain internal procedures related to recording and complying with customers' do-not-call requests made specifically to Juicy's. *Id.* at 16–18. The class members intend to seek monetary damages for the alleged statutory violations, which are provided for in the TCPA. *Id.* at 17–18 (citing 47 U.S.C. § 227(c)(5)). In particular, they will seek up to $500 per statutory violation and triple that amount if they prove Juicy's willfully or knowingly violated the TCPA's requirements. *Id.* at 16.

Schmitendorf now moves to certify a class. Doc. 72. He defines the class as:

> All persons who, on or after four years prior to the filing of the initial complaint in this action through the date of class certification, (1) were sent more than one text message to their residential telephone number by Juicy's, (2) in any twelve month period, (3) for a substantially similar reason as Juicy's texted Plaintiff, (4) including at least one text message after making an opt-out request by text to Juicy's.

*Id.* at 9–10. That class, he asserts, meets Rule 23(a)'s threshold requirements of numerosity, commonality, typicality, and adequacy. *Id.* at 10–14.

Schmitendorf further relies on Rules 23(b)(3) and 23(b)(2) to certify the class. Doc. 72 at 9. According to Schmitendorf, the proposed class should be certified under Rule 23(b)(3) because common issues predominate over individual ones, and a class action is superior to alternative methods of litigation. *Id.* And he asserts that Rule 23(b)(2) certification is also appropriate because Juicy's has "acted or refused to act on grounds that apply generally to the class." *Id.* (citing Fed. R. Civ. P. 23(b)(2)). The class, if certified under Rule 23(b)(2), seeks to enjoin Juicy's from further violating the TCPA. *Id.* at 8. Juicy's opposes Schmitendorf's motion on several grounds, arguing that his class definition is overbroad, that individual issues predominate over common ones, that Schmitendorf is an inadequate and atypical class representative, and that certifying a class for injunctive relief is inappropriate. Doc. 81.

## II

4

Schmitendorf has not met the requirements to certify a class. He has not shown that the proposed class's common issues predominate over individual ones under Rule 23(b)(3). Nor has he met Rule 23(b)(2)'s requirements to certify a class for injunctive relief. As a result, Schmitendorf's motion for class certification is denied.

## A

A full exploration of the parties' arguments first requires describing the Telephone Consumer Protection Act and what a plaintiff like Schmitendorf must prove to prevail under its provisions. In 1991, Congress enacted the TCPA in response to "the proliferation of intrusive calls to [consumers'] homes from telemarketers." *F.T.C. v. Mainstream Mktg. Servs., Inc.*, 345 F.3d 850, 857 (10th Cir. 2003) (citing Pub. L. No. 102–243 at § 2 (Dec. 20, 1991)); *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 149 (2025). Among other things, the TCPA banned certain telemarketing practices that Congress found were invading consumers' privacy in their homes. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 371 (2012). In addition, it directed the FCC to promulgate regulations that "protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

The FCC has established two ways for a consumer to stop receiving invasive communications from telemarketers. The first allows a residential telephone subscriber to register his or her phone number on a national do-not-call registry. 47 C.F.R. § 64.1200(c)(2). If the subscriber does so, telemarketers may not initiate phone solicitations to that phone line. *Id.* The second way—which is relevant to Schmitendorf's class-certification motion—allows a consumer to opt out of a specific seller's telemarketing calls. 47 C.F.R. § 64.1200(d). To enforce that method, the TCPA's implementing regulations require telemarketers to institute procedures for maintaining an internal do-not-call list and for honoring the do-not-call requests it receives. 47 C.F.R. § 64.1200(d)(1)–(6). The procedures must meet certain minimum standards, including maintaining a written policy governing an internal do-not-call list, training personnel about the existence and use of the do-not-call list, recording and honoring do-not-call requests, and maintaining the requests for five years after they are made. *Id.*

Subscribers need not rely on the FCC to enforce these regulations because the TCPA creates a private right of action to sue telemarketers that violate Section 227 regulations. 47 U.S.C. § 227(c)(5). The private

right of action authorizes suits to be brought by any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." *Id.* A plaintiff suing under Section 227(c)(5) may seek injunctive relief, money damages up to $500 per violation, or both. *Id.* at § 227(c)(5)(A)–(C). The money damages may be tripled if the defendant willfully or knowingly violated the TCPA. *Id.* at § 227(c)(5).

B

Schmitendorf seeks to certify a class of individuals who received text messages from Juicy's in violation of Section 64.1200(d). Doc. 72. He argues that Juicy's failed to institute internal do-not-call procedures satisfying Section 64.1200(d)'s minimum standards before it sent telemarketing communications to the putative class members. *See generally id.* Schmitendorf defines the class as follows:

> All persons who, on or after four years prior to the filing of the initial complaint in this action through the date of class certification, (1) were sent more than one text message to their residential telephone number by Juicy's, (2) in any twelve month period, (3) for a substantially similar reason as Juicy's texted Plaintiff, (4) including at least one text message after making an opt-out request by text to Juicy's.

*Id.* at 9–10.

To be certified, Schmitendorf's proposed class must meet the four Rule 23(a) prerequisites for certification—numerosity, commonality, typicality, and adequacy of representation. *See Comcast*, 569 U.S. at 33. If the prerequisites of Rule 23(a) are met, then Schmitendorf must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.*

Schmitendorf invokes two of Rule 23(b)'s provisions. Doc. 72 at 15–20. He first invokes Rule 23(b)(3), *id.* at 15, which means he must show that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). He also invokes Rule 23(b)(2), seeking classwide injunctive relief. Doc. 72

at 20. That provision requires Schmitendorf to show that Juicy's "has
acted or refused to act on grounds that apply generally to the class, so
that final injunctive relief or corresponding declaratory relief is appro-
priate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Even assuming Schmitendorf meets his initial burden under Rule
23(a), he has not shown that certification is proper under Rule 23(b).[2]
First, he has not demonstrated that common issues predominate over
individualized ones, as required by Rule 23(b)(3). Second, he has not
shown that Juicy's conduct is likely to recur, making an injunctive-relief
class under Rule 23(b)(2) improper.

1

To certify a class under Rule 23(b)(3), Schmitendorf must satisfy
that Rule's predominance inquiry. That inquiry "tests whether pro-
posed classes are sufficiently cohesive to warrant adjudication by rep-
resentation." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076,
1087 (10th Cir. 2014). In short, predominance requires first identifying
each aspect of a claim and categorizing whether each aspect is individ-
ualized or common based on the inquiry and proofs required, and then
weighing the common questions against the individualized questions.
*Id.*; *see also Wallace*, 725 F.3d at 1220. Where the injury is common to
the class and stems from the same legal theory, common questions are
more likely to predominate. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,
625 (1997).

Schmitendorf argues that common issues predominate. Doc. 72 at
16. In particular, he states that the primary issues in this lawsuit center

---

[2] Juicy's contests Schmitendorf's ability to meet nearly each of Rule 23's re-
quirements for class certification. *See generally* Doc. 81. But these arguments
significantly overlap both among each other and with Juicy's predominance
arguments under Rule 23(b)(3). *See Wallace B. Roderick Revocable Living Tr. v.
XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013) (noting that the Rule
23(a) requirements "tend to merge"). Juicy's arguments opposing class certi-
fication are stronger under Rule 23(b), so it is assumed without deciding that
Schmitendorf meets Rule 23(a)'s threshold certification requirements. *See
Monreal v. Potter*, 367 F.3d 1224, 1235 (10th Cir. 2004) (declining to reach
threshold class certification requirements because the plaintiffs failed to sat-
isfy Rule 23(b)'s requirements); *see also Wallace*, 725 F.3d at 1220 (noting that
Rule 23(b)'s "predominance criterion is 'far more demanding' than Rule
23(a)'s commonality requirement").

around whether Juicy's instituted adequate internal do-not-call proce-
dures. *Id.* at 16. Those issues, according to Schmitendorf, depend on
common evidence that will generate the same answer for the entire
class. *See id.* Juicy's disagrees. It contends that multiple issues will re-
quire individualized inquiries to be resolved. *See* Doc. 81 at 14–31. Al-
though not every issue Juicy's identified defeats predominance, Juicy's
has shown that at least one issue—whether Juicy's sent its text mes-
sages to residential phone lines—will require fact-specific inquiries
specific to each class member such that Schmitendorf's TCPA claim is
unfit for class certification.

a

The predominance inquiry "begins, of course, with the elements
of the underlying cause of action." *CGC Holding*, 773 F.3d at 1088
(quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809
(2011)). The Tenth Circuit has not articulated the elements of a TCPA
claim alleging violations of Section 64.1200(d). And neither party has
identified the elements of a Section 64.1200(d) claim. *See* Doc. 72 at
17–18 (discussing some elements of a TCPA claim); Doc. 81 at 15
(Juicy's brief noting that the elements "include, but are not limited to"
three things but going on to discuss additional elements).

To determine the elements of Schmitendorf's claim, the text of the
TCPA, the FCC's implementing regulations, and authority from other
jurisdictions are instructive. For one, a plaintiff must be eligible to
bring a private right of action under the TCPA. 47 U.S.C. § 227(c)(5);
*see also Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir.
2019). That means the defendant must have sent the plaintiff at least
two messages within a 12-month period, each in violation of Section
64.1200(d). *Murray v. Grocery Delivery E-Services USA Inc.*, 55 F.4th 340,
347 (1st Cir. 2022). To establish that the text messages violated Section
64.1200(d), the plaintiff must show that the defendant initiated the text
messages and sent them to a residential telephone line for telemarket-
ing purposes. 47 C.F.R. § 64.1200(d); *see also Charvat v. NMP, LLC*, 656
F.3d 440, 449 (6th Cir. 2011). And finally, the plaintiff must prove that
the defendant sent the text messages without adequate procedures in
place to maintain and honor do-not-call requests, as required by Sec-
tion 64.1200(d). *Cordoba*, 942 F.3d at 1265.

Only one affirmative defense is available. Specifically, a defendant
may show that it "has established and implemented, with due care, rea-
sonable practices and procedures to effectively prevent telephone

8

solicitations in violation of the regulations prescribed under this sub-section." 47 C.F.R. § 64.1200(d).

**b**

Having identified the elements of Schmitendorf's claim, the second step in determining predominance is to categorize each element or defense as one that can be met with common proof or, in contrast, as one that will require individualized evidence. *See Menocal v. GEO Group, Inc.*, 882 F.3d 905, 915 (10th Cir. 2018). Schmitendorf has identified common evidence that will resolve many of the questions for the whole class. But he has not met his burden, under Rule 23's "rigorous analysis," *CGC Holding*, 773 F.3d at 1087, to affirmatively demonstrate through evidentiary proof that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues," *Brayman v. KeyPoint Gov. Sols., Inc.*, 83 F.4th 823, 837–38 (10th Cir. 2023).

**1.** Schmitendorf has identified several common issues. A common issue is one "for which the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1175 (10th Cir. 2023) (internal citations omitted).

Start with whether each class member received at least two text messages from Juicy's in a 12-month period. Schmitendorf has produced expert opinions that he intends to use to show how many text messages Juicy's sent, when it sent them, and whether the class members received them. Doc. 74-2. Specifically, Schmitendorf's expert, Aaron Woolfson, analyzed records from the third-party platforms that sent the telemarketing campaigns upon Juicy's request. Doc. 72 at 10–11 (citing Doc. 74-2). Woolfson identified 567 phone numbers to which Juicy's sent two or more text messages within a 12-month period. Doc. 74-2 at ¶ 36. Woolfson's conclusions are generalized, class-wide proof that will generate an answer to each class member's claims even if the class members received a different number of text messages. This is sufficient. *Black*, 69 F.4th at 1181 (finding that expert testimony showing the defendant's impact on all class members was sufficient to make the class members' injuries a common issue even though they had varying degrees of injury).

That Juicy's contests the reliability of Woolfson's report does not change the classwide nature of the evidence. *Contra* Doc. 81 at 22–25.

The only evidence Schmitendorf has identified to prove that the putative class members received two or more text messages in a 12-month period and that they sent opt-out requests is Woolfson's analysis of the third-party platforms' records. *See* Doc. 72 at 10–11. If Juicy's succeeds in its contention that Woolfson's report is inaccurate or misrepresentative, then the class will lack evidence to prove an essential element of its claim. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457 (2016) (explaining that an issue may be characterized as common where the defendant's primary argument is that the plaintiff's evidence is unrepresentative or inaccurate because it will result in a finding that the plaintiff failed to prove an essential element of the claim for the entire class). In other words, Juicy's concern as it relates to Woolfson's report "is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action." *See id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 NY.U. L. Rev. 97, 107 (2009)) (alteration in original).

Take another element of Schmitendorf's claim: whether Juicy's sent the aforementioned text messages in violation of Section 64.1200(d). Again, Schmitendorf asserts that common evidence will generate the same answer for every class member because Juicy's either instituted proper procedures or it did not. Doc. 72 at 16. That is true: Employee testimony and Juicy's own business records are common evidence that will prove, for every class member, whether Juicy's instituted adequate procedures or not. *See CGC Holding Co.*, 773 F.3d at 1091–92 (noting that an issue is common when a uniform piece of evidence "can resolve a central issue of [the] litigation in one swoop"); *Menocal*, 882 F.3d at 921 (finding that the defendant's uniform policy that pertained to each class member's claim was a uniform piece of evidence that could result in the same the same answer for all class members).

So, too, with whether Juicy's initiated the text messages at issue and if it did so for telemarketing purposes. *See* Doc. 72 at 16–17 (acknowledging that Schmitendorf must prove that Juicy's sent the text messages for telemarketing purposes); Doc. 81 at 15–19 (noting that the question of whether Juicy's, as opposed to a third-party platform, initiated the text messages will be an issue at trial). The class members' success on those elements will depend on testimony and documentary evidence common to the class, meaning the entire class will "prevail or fail in unison" regarding those issues. *Amgen Inc.*, 568 U.S. at 459–60.

Finally, one remaining issue is common because Juicy's attempts to rebut Schmitendorf's classwide evidence through mere speculation. *Contra* Doc. 81 at 20. Juicy's asserts that individualized inquiries will be necessary to determine whether class members who sent opt-out requests to SlickText intended to opt out of Juicy's telemarketing campaigns, as opposed to some other entity. *Id.* That is because SlickText sent text messages for other entities, too, like Lopes Active Apparel. Doc. 74-3 at 1 (indicating that SlickText sent text messages that stated, "FIRE SALE This weekend only save 30% sitewide at Lopes Active Apparel Offer expires 04/03/2022"). But Juicy's did not support its assertion with any examples or evidence suggesting that the proposed class members who received Juicy's text messages also received text messages promoting other companies' products. That is insufficient to satisfy its burden at this stage of the proceedings. *Menocal*, 882 F.3d at 921 n.11 (explaining that the defendant's possible alternative reasons for the plaintiffs' actions—other than the defendant's conduct—was mere speculation and did not defeat predominance).

**2.** One issue, however, will require an individualized inquiry for each class member. Specifically, evidence will vary for each class member to prove he or she was a "residential telephone subscriber" as that term is contemplated by the TCPA. *See* 47 C.F.R. § 64.1200(d) (prohibiting entities from making calls to residential telephone subscribers unless they have implemented adequate do-not-call procedures); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Dish Network, LLC*, 17 F.4th 22, 28 (10th Cir. 2021) (noting that the TCPA protects "residential telephone line[s]").

Neither the TCPA nor its implementing regulations define the term "residential telephone subscriber." Generally, though, the Tenth Circuit has concluded that residential telephones are landlines associated with homes rather than businesses. *See Mainstream Mktg. Servs.*, 358 F.3d at 1233; *Barr*, 591 U.S. at 648 (Gorsuch, J., concurring). And it is no surprise, given the ubiquity of consumers moving from land lines to cell phones, that they can count, too. *See Nat'l Union Fire Ins. Co.*, 17 F.4th at 28; *see also Hood*, 21 F.4th at 1220 (considering jurisdiction in a TCPA case based on cell phone contacts); *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1225 (9th Cir. 2022) (analyzing this issue). But not always. *See Carpenter v. United States*, 585 U.S. 296, 310–12 (2018) (describing the myriad of ways in which individuals use cell phones); *Chennette*, 50 F.4th at 1225 (discussing mixed-use cell phones in the TCPA context). As a result, the more difficult question is under what circumstances a

cell phone is considered residential, and in what circumstances it may be considered a business line instead. *Id.* (collecting cases that have grappled with the issue of when mixed-use cell phones are considered residential under the TCPA).

The parties' dispute on this issue is significant. Schmitendorf says the focus is on the *purpose* for which Juicy's obtained and customers provided the phone numbers. Doc. 90 at 14. Juicy's, however, argues that the proper inquiry centers around how each individual *uses* his or her cell phone. Doc. 81 at 29–30.

The text of the TCPA supports Juicy's interpretation of "residential telephone subscriber." The TCPA does not define the term, so it carries its "ordinary, contemporary, common meaning." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433–34 (2019) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). When Congress enacted the TCPA in 1991, "subscriber" meant a person who "agree[s] to receive a periodical or service regularly." *Subscribe/Subscriber*, Webster's Ninth New Collegiate Dictionary (9th ed. 1989). Applying that to the TCPA, a telephone subscriber "is an individual who makes regular payments to *use* [a] telephone service on an ongoing basis." *Wilson v. Hard Eight Nutrition LLC*, No. 25-00144, 2025 WL 1784815, at *5 (D. Or. June 27, 2025). And "residential" in 1991 meant "used as a residence or by residents." *Residential*, Webster's Ninth New Collegiate Dictionary (9th ed. 1989). So, putting the terms together, a "residential telephone subscribers" are people "who make regular payments to *use* a telephone service at home, that is, people who use a telephone for a personal or private purpose—a *use* traditionally tied to the home—as opposed to a commercial or business use." *Wilson v. Hard Eight Nutrition LLC*, No. 25-00144, 2025 WL 1784815, at *5 (D. Or. June 27, 2025); *Lirones v. Leaf Home Water Sols., LLC*, 23-2087, 2024 WL 4198134, at *6 (N.D. Ohio Sept. 16, 2024) ("According to the TCPA's plain language and dictionary definitions of 'residence' and 'subscriber,' 'a residential subscriber is one who maintains a phone for residential purposes . . . i.e., for personal activities associated with his or her private, domestic life.'"). Accordingly, when considering whether each class member received Juicy's texts at a residential telephone, the proper inquiry is whether he or she used the cell phone for purposes associated with the home.

The Tenth Circuit has not explored the distinction between a cell phone's residential uses and its non-residential—*e.g.*, business—ones. Other jurisdictions, however, have articulated factors that guide the

inquiry. *Chenette*, 50 F.4th at 1225 (collecting cases). Those include "whether plaintiffs have held out to the public or advertised their phone numbers for business purposes," "whether plaintiffs' phones are registered with the telephone company as residential or business lines," "whether, and the extent to which, plaintiffs use their phones for business transactions or employment," and "whether, and the extent to which, plaintiffs' employers (or other business entities) pay for or reimburse plaintiffs for their phone bills." *Id.* Those cases emphasize the fact-specific inquiry that mixed cell-phone use demands. *See, e.g., Payne v. Sieva Networks, Inc.*, 347 F.R.D. 224, 228 (N.D. Cal. 2024); *Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 131 (N.D. Tex. 2020); *Stevens-Bratton v. TruGreen, Inc.*, 437 F. Supp. 3d 648, 658 (W.D. Tenn. Feb. 4, 2020).

Schmitendorf's own phone use is a good example. At the pleading stage, Schmitendorf plausibly alleged that he was a residential telephone subscriber because he alleged that he registered his cell phone one the national do-not-call registry, which carries a presumption that a phone line is residential, and he alleged "that he used his cell phone only in personal contexts." Doc. 67 at 5. That was sufficient to survive Juicy's motion for judgment on the pleadings. *Id.* at 4 (citing *Marks v. Unique Lifestyle Vacations, LLC*, No. 20-4915, 2021 WL 5495778, at *3 (E.D. Pa. Nov. 22, 2021), and then citing *Klassen v. Solid Quote LLC*, No. 23-0318, 2023 WL 7544185, at *3 (D. Colo. Nov. 14, 2023)). With the benefit of discovery, however, Juicy's has shown that Schmitendorf also uses his cell phone for business purposes. Doc. 81 at 8 (citing Doc. 73-3). For example, Schmitendorf uses his cell phone for personal communications, but he also uses it to apply for jobs, communicate with his boss, and swap shifts with his co-workers. *Id.* (citing Doc. 73-3).

At the certification stage, it is not necessary to decide whether Schmitendorf is indeed a residential telephone subscriber. *Black*, 69 F.4th at 1174 (noting that merits questions may only be considered at the certification stage to the extent that they are relevant to determine whether the Rule 23 prerequisites for class certification are satisfied). Instead, the circumstances surrounding Schmitendorf's cell phone use demonstrate the fact-specific nature of the inquiry concerning his cell phone. *See Hirsch*, 337 F.R.D. at 131 (explaining that the named plaintiff's mixed cell-phone use provided a good example of the fact-specific inquiry required to determine whether the phone line was residential). That evidence involving every class member's cell-phone use will

vary, making it an individualized inquiry. That case-by-case variation precludes class treatment. *Black*, 69 F.4th at 1175 (noting that individual issues involve evidence that varies for each class member).

Schmitendorf presents no common evidence to show that each class member was a residential telephone subscriber. *Contra* Doc. 90 at 14. He argues that common evidence will show that Juicy's obtained, and customers provided, the cell-phone numbers for the purpose of a "consumer (not business) transaction." Doc. 90 at 14. But, as explained above, that negates the ordinary meaning of residential telephone subscriber because it focuses on the motives of the entity requesting and the individual providing a cell-phone number rather than how the individual uses the phone. The former is immaterial; the latter is the sole focus of the TCPA. As one court noted, focusing on the business's motive for obtaining the class members' phone numbers "would turn the relevant inquiry on its head by shifting the analysis from the consumer's use of the telephone to the caller's purpose in making the call." *Stevens-Bratton*, 437 F. Supp. 3d at 659.

Schmitendorf's authority to the contrary is not persuasive. The only case he cites to support his interpretation of "residential telephone subscriber" is *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 332 (W.D. Okla. 2018). True, classwide evidence in that case was sufficient to show "that defendants intended to call, and did call, residential telephone numbers." *Braver*, 329 F.R.D. at 332. But that was sufficient because the residential customers in that case supplied their *landline* telephone numbers. *Id.* That is different than here, where the question is whether the class members' cell phones usages are analogous to the landlines analyzed in *Braver*.

Nor does Schmitendorf's proposed solution convert the individualized issue into a common one. He says each class member can submit an affidavit at the class-notice stage indicating that he or she supplied Juicy's a residential telephone number. Doc. 90 at 15. But this is insufficient. The fact-specific inquiry that Juicy's is entitled to conduct for every class member cannot be answered simply by accepting as true the class member's subjective answer to whether or not a cell phone is residential. Juicy's is entitled to challenge and, where appropriate, contest such declarations. *See Payne*, 347 F.R.D. at 227 (noting that simply asking class members during the class notification process whether the phone line in question was a residential one would not satisfy the fact-intensive analysis required to determine whether a phone line met the TCPA's requirements).

**c**

One individualized issue does not necessarily defeat class certification, so the final step in the predominance analysis is to determine whether common issues in the case predominate over the individual ones. *Black*, 69 F.4th at 1175. Predominance does not require that common issues outnumber individual ones; it merely "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623. Schmitendorf has not met his burden to show that common questions will predominate over the individual inquiries that proving class members were residential telephone subscribers demands. *See Hirsch*, 337 F.R.D. at 131 (noting that the plaintiff had the burden to "advance a viable theory employing generalized proof to establish residential status and therefore liability").

Weighing the issues requires considering "how a trial on the merits would be conducted if a class were certified." *Wallace*, 725 F.3d 1213 at 1220 (quoting *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326–29 (5th Cir. 2008)). At trial, Juicy's will be entitled to argue that Schmitendorf was not a residential telephone subscriber, which would doom Schmitendorf's (and only Schmitendorf's) TCPA claim. *See Amchem Prods., Inc.*, 521 U.S. at 624–25 (noting that individualized questions on liability and defenses of liability may preclude class certification). And if Schmitendorf's class is certified, Juicy's will have the opportunity to do this for every class member's phone use. *Wallace*, 725 F.3d at 1219–20 (noting that a defendant's non-frivolous defenses to liability that are unique to individual class members may submerge common questions); *Dukes*, 564 U.S. at 366 ("Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay.").

Schmitendorf's proposed class could collectively prove every other element of a TCPA claim but still be no closer to establishing Juicy's liability absent common proof that the class members were residential telephone subscribers. *See Hirsch*, 337 F.R.D. at 131 (noting that no "single source answers this question for each phone number" and that each class member's cell-phone use "must be tested individually"). The fact that Juicy's contests the residential nature of the class members' phone lines and the fact-specific nature of the inquiry suggest that this will become a central issue at trial. *Cf. Menocal*, 882 F.3d at 926 (finding that under the specific circumstances, it was likely that the class members could establish an essential element of the claim "based not on individualized transactions but on the 'overall context' and 'uniform

policies' shared by all class members); *Hirsch*, 337 F.R.D. at 131 (predicting that residential cell-phone use would be a central issue at trial in a similar case). As a result, Schmitendorf cannot show predominance. *Brayman*, 83 F.4th at 839 (noting that class certification should not be granted where the plaintiff has not pointed to evidence in the record showing that an issue is common); *Jackson v. Athena Bitcoin, Inc.*, 2025 WL 2375273, at *3 (N.D. Fla. July 16, 2025) (noting that the plaintiff's lack of legal support and failure to engage with the fact-specific inquiry as to whether a cell phone is residential or business supported finding that he did not meet the fact-specific mixed-use inquiry).

Again, Schmitendorf's contrary arguments fall short. He argues that under the qualitative predominance inquiry, the more important issues are common—i.e., whether Juicy's instituted adequate internal do-not-call policies. Doc. 90 at 14. But Schmitendorf does not support his assertion that those issues are more important or more primary to the putative class's claim. Congress used the language "residential telephone subscriber" for a reason: It "found that unrestricted telemarketing can be an intrusive invasion of privacy and that many consumers are outraged by the proliferation of intrusive calls *to their homes* from telemarketers." *Mainstream Mktg. Servs., Inc.*, 345 F.3d at 857 (emphasis added). To consider other elements more important would question Congress's judgment in incorporating the "residential" language. *A.F. ex rel Christine B. v. Espanola Pub. Schs.*, 801 F.3d 1245, 1250 (10th Cir. 2015) (noting that federal courts should not "displace Congress's plain and plainly rational directions" with their own). Schmitendorf has not affirmatively demonstrated through evidentiary proof that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Brayman*, 83 F.4th at 837–38.

### 2

Invoking Rule 23(b)(2), Schmitendorf also attempts to certify his class as one seeking classwide injunctive relief. Doc. 72 at 20. Schmitendorf asserts that class certification is proper because a single injunction would provide relief to the entire class. *Id.* Rule 23(b)(2) provides that "a class action may be maintained," in part, if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) imposes two independent but related

requirements." *Shook v. Bd. of Cnty. Comm'rs of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008). First, "the defendants' actions or inactions must be based on grounds generally applicable to all class members." *Id.* Second, the injunctive relief sought must "be appropriate for the class as a whole." *Id.*

Juicy's asserts that Schmitendorf's proposed class should not be certified under Rule 23(b)(2) because Juicy's has not sent—nor does it intend to send—any more promotional text messages since 2022. Doc. 81 at 33–34. Although Juicy's does not label its argument as a standing one, Juicy's arguments implicate Article III. *See Rector v. City and County of Denver*, 348 F.3d 935, 949–50 (10th Cir. 2003) (noting that class cannot be certified when the named representative lacks standing). Juicy's contention is correct: Schmitendorf does not have standing because he has not established, as a named plaintiff must, that he is "suffering a continuing injury or [is] under an imminent threat of being injured in the future." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1197 (10th Cir. 2010).

A plaintiff only has standing to seek injunctive relief if he or she shows a "real or immediate threat that he will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *accord Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1211 (10th Cir. 2014) (applying this principle in the class-action context). Schmitendorf has not shown that he will be wronged again because Juicy's has not sent any text messages since 2022, nor is there any evidence in the record demonstrating that it intends to send more text messages. Without that, Schmitendorf does not have standing to seek an injunction. *See Courage to Change Ranches Holding Co. v. El Paso Cnty., Colo.*, 73 F.4th 1175, 1188 (10th Cir. 2023) (finding that a plaintiff did not have standing to challenge a residential services company that had closed and no longer offered the services being challenged); *Redmond v. Crowther*, 882 F.3d 927, 942 (10th Cir. 2018) (finding that a plaintiff did not have standing because the plaintiff sought injunctive relief based only on speculation that a similar incident would occur in the future). And Schmitendorf does not appear to challenge Juicy's assertion that it has no plans to send more promotional text messages because he did not discuss Juicy's Rule 23(b)(2) arguments in his reply brief. *See Therrien v. Target Corp.*, 617 F.3d 1242, 1253 (10th Cir. 2010) (noting that an argument was waived in part because the party did not contend the opponent's arguments in its reply brief). As a result, certification of Schmitendorf's Rule 23(b)(2) class is improper because "the personal

claim[ ] of the named plaintiff[ ] [is] satisfied and no class has been . . . certified." *See Clark*, 590 F.3d at 1141.

## III

For the foregoing reasons, Schmitendorf's Motion for Class Certification, Doc. 72, is DENIED.

It is so ordered.

Date: October 21, 2025             _s/ Toby Crouse_____
                                   Toby Crouse
                                   United States District Judge